**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 18-cr-00389-RBJ

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**3. JERAMYAH GONZALEZ, a/k/a JOSEPH PEÑA, a/k/a JOSEPH SANCHEZ**,

      Defendant.
_____

**MOTION FOR COMPASSIONATE RELEASE**
_____

      Jeramyah Gonzalez, by and through undersigned counsel, hereby moves the Court to grant his immediate release to home confinement pursuant to the provisions of 18 U.S.C. § 3582(c)(1)(A). Mr. Gonzalez states the following grounds:

**I.    Introduction**

      Jeramyah Gonzalez is presently serving a 24-month sentence imposed upon his plea of guilty to Aggravated Identity Theft. The Federal Bureau of Prisons (BOP) has designated Mr. Gonzalez to serve this sentence at FCI-Englewood.

      Mr. Gonzalez suffers from several pre-existing medical conditions that make him significantly more vulnerable to severe complications including death should he contract COVID-19. With a Body Mass Index (BMI) rating of

somewhere between 35 and 41, Mr. Gonzalez is diagnosed as clinically obese. In addition, Mr. Gonzalez was diagnosed with type II diabetes mellitus in 2012, for which he has received routine medical treatment and takes medication, and also has hypertension (high blood pressure), for which he is prescribed lisinopril. In March 2020, he was screened and determined to be at high risk for sleep apnea – he was scheduled for a sleep study but has not been transported for one since the onset of the pandemic. BOP medical records support various complaints regarding his respiratory function, which may further complicate his overall medical condition should he contract COVID-19.

This combination of medical conditions subjects Mr. Gonzalez to an extreme risk of complications and severe negative outcomes should he contract COVID-19. When considered in light of the inherent risk of transmission of infectious disease associated with the incarceration setting, as well as the risk factors for COVID-19 specific to Mr. Gonzalez's facility of designation (FCI-Englewood), these medical issues present the type of "extraordinary and compelling reasons" justifying a reduction in Mr. Gonzalez's sentence pursuant to § 3582(c)(1)(A).

Undersigned counsel informs the Court that he conferred with Assistant United States Attorney Martha A. Paluch on August 4, 2020 and again on October 6, 2020. Ms. Paluch indicates that the government opposes the instant

2

motion due to the fact that 1) the defendant's age, 37, does not place him at a higher risk to contract COVID; 2) while the government agrees that the defendant's Type 2 diabetes and obesity place him at a higher risk for serious illness if he contracts COVID, there is no evidence to indicate that the Federal Correctional Institution in Englewood, Colorado has failed to employ appropriate measures to counter the virus; and 3) to grant his release now would undermine the sentencing objectives set forth in 18 USC 3553(a). The government agrees that Mr. Gonzalez has exhausted administrative remedies.

## II.    Procedural History

On August 21, 2018, an Indictment (Doc. 1) was filed against Mr. Gonzalez and four co-defendants. The case concerned a scheme to obtain money by submitting fraudulent applications for federal student loan funds. (PSI, Doc. 173, pp.3-7). Mr. Gonzalez was named only in Counts 6 (Mail Fraud) and 7 (Aggravated Identity Theft). According to the PSI, Mr. Gonzalez unlawfully received and spent $10,383.70 as the result of his participation in the scheme. PSI, ¶14.

On April 11, 2019, the Defendant pled guilty to Count 7 (Aggravated ID Theft). Pursuant to 18 U.S.C. § 1028A(a)(1), a Defendant convicted of this offense "shall… be sentenced to a term of imprisonment of 2 years." There is no other applicable provision that would have allowed the Court at the time of

sentencing to impose a sentence greater or less than 2 years. At a sentencing hearing held October 16, 2019, the Court imposed the mandatory two-year term, to be followed by one year of supervised release. See, *Courtroom Minutes*, Doc. 179.

The Court did not remand Mr. Gonzalez at the conclusion of the sentencing hearing, but rather allowed him to voluntarily surrender once designated to an institution by the Bureau of Prisons. Mr. Gonzalez received the Order to Surrender (Doc. 182) on November 14, 2019 and reported to FCI Englewood to commence serving the sentence on November 28, 2019. As of the date of this filing, Mr. Gonzalez has served 314 days (more than 10 months).

On May 18, 2020 Mr. Gonzalez filed a *pro se* motion (Doc. 185) for compassionate release citing 18 U.S.C. § 3582(c)(1)(a) and the CARES Act §12003(b)(2). The following day, undersigned counsel was appointed to assist Mr. Gonzalez with his compassionate release request pursuant to District Court General Order 2020-07. On July 6, 2020 the Court entered an order (Doc. 190) denying Mr. Gonzalez's pro se motion and indicating that "counsel should confer with the AUSA and then file a motion requesting a compassionate release if appropriate."

**III.    The Court has the authority to resentence Mr. Gonzalez pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) due to the "extraordinary and compelling reasons" presented by the COVID-19 pandemic and Mr. Gonzalez' serious health conditions that place him at high risk.**

Congress first enacted the modern form of the compassionate release statute, codified at 18 U.S.C. § 3582, as part of the Comprehensive Crime Control Act of 1984. Section 3582(c) states that a sentencing court can reduce a sentence whenever "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). Prior to the passage of the First Step Act in 2018, the Court's authority to modify a previously imposed sentence was conditioned upon the filing of a motion by the Director of the Federal Bureau of Prisons (BOP). Regardless how compelling the reasons might be, a defendant had no ability to make a request for a sentence reduction on his own. Perhaps unsurprisingly, BOP's used its statutory authority to file such motions on behalf of prisoners far too sparingly.[1]  The Inspector General of the Department of Justice studied BOP's compassionate release program in 2013, and found that it was "poorly managed and that its inconsistent and ad hoc implementation has likely resulted in potentially eligible inmates not being considered for release and . . .

---

[1] *See, e.g.*, Bryant S. Green, Comment, *As the Pendulum Swings: The Reformation of Compassionate Release to Accommodate Changing Perceptions of Corrections*, 46 U. Tol. L. Rev. 123, 136-39 (2014); Casey N. Ferri, *A Stuck Safety Valve: The Inadequacy of Compassionate Release for Elderly Inmates*, 43 Stetson L. Rev. 197, 219-25 (2013); Human Rights Watch & Families Against Mandatory Minimums, *The Answer Is No: Too Little Compassionate Release in US Federal Prisons* (2012), available at: https://www.hrw.org/report/2012/11/30/answer-no/too-little-compassionate-release-us-federal- prisons

terminally ill inmates dying before their requests for compassionate release were decided." U.S. Dep't of Justice, Office of the Inspector General, Evaluation and Inspections Division, *The Federal Bureau of Prisons' Compassionate Release Program* (April 2013).[2]

The First Step Act became law on December 21, 2018. Among other reforms, the Act gave defendants in certain circumstances the ability to file their own compassionate release motions with the sentencing court rather than being required to wait for BOP to do so. 18 U.S.C. § 3582(c)(1)(a) now authorizes the court to reduce a defendant's term of imprisonment "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."

## A.    Exhaustion of Administrative Remedies

18 U.S.C. § 3582(c)(1) authorizes the court to reduce a defendant's term of imprisonment "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative

---

[2] https://oig.justice.gov/reports/2013/e1306.pdf

rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

Mr. Gonzalez has done everything within his power to comply with the requirement that he exhaust administrative remedies prior to bringing this motion:

- On or about April 22, 2020, Mr. Gonzalez directed his initial request for a reduction in sentence ("RIS" in BOP parlance) to FCI-Englewood's Warden, B. Greilick. Exhibit A.[3]  This request for administrative remedy was assigned Case No. 1016510-F1 by BOP.

- On April 23, 2020, Warden Greilick issued a form letter to Mr. Gonzalez indicating that his RIS request had been denied. Exhibit B[4], p.3.

- On April 24, 2020, Mr. Gonzalez appealed the Warden's decision by submitting a "Request for Administrative Remedy" on Form BP-229.

_____

[3]  A copy of this document was not included in BOP's response to Mr. Gonzalez's FOIA request and does not appear to be available through BOP. The copy attached as Exhibit A was provided to counsel by Mr. Gonzalez and attached to his pro se motion.
[4]  Exhibit B contains the entirety of documents produced by BOP in response to counsel's FOIA request seeking "[a]ny documents related to Mr. Gonzalez's pursuit of administrative remedies in connection with a RIS request, to include all information and documents entered into the RIS tracking system by or for RIS Tracking Coordinators at the institution and at the regional and/or CO levels."

This request was received by the Administrative Remedy Clerk at FCI Englewood on April 29, 2020. Exhibit B, p.2.

- On May 1, 2020, Mr. Gonzalez's BP-229 Request for Administrative Remedy was denied by the Warden. Exhibit B, p.4.

- Mr. Gonzalez then submitted an appeal to the Regional Director, which was received by the Regional Administrative Remedy Clerk on May 8, 2020. That form was rejected due to a clerical error, and Mr. Gonzalez re-submitted it on June 15, 2020. These forms were not included by BOP in undersigned counsel's FOIA request, but the information was confirmed to undersigned counsel by a BOP employee. Counsel is working on obtaining an abstract or a copy of the original form[5].

- The re-submitted BP-10 regional appeal was denied by Regional on July 8, 2020. Mr. Gonzalez received notice of the denial on July 30, 2020 and mailed another appeal (Form BP-11) to the General Counsel on July 31. Undersigned counsel has been unable to obtain documentation from BOP confirming that the final appeal was received by the General Counsel.

---

[5] Undersigned counsel informs the Court that the procedure for obtaining documents concerning administrative remedy appeals from BOP is frustratingly Byzantine.

In addition to his efforts to exhaust the direct administrative appeals of BOP's denial of his request for reduction in sentence, Mr. Gonzalez engaged in an ancillary appeal. Mr. Gonzalez was informed by his counselors that he met criteria for a reduction in sentence (RIS) placing him in home confinement through the Bureau's own procedure but for one fact – he was assigned a "Public Safety Factor" due to a Colorado juvenile adjudication for Indecent Exposure that he had sustained more than 22 years prior[6]. Despite the fact that the adjudication was for a misdemeanor that was remote in time and occurred when Mr. Gonzalez was 15 years old, his BOP counselor informed him that it disqualified him from RIS consideration within the Bureau.

Mr. Gonzalez initiated a separate administrative proceeding (1039851-F1) appealing BOP's determination that the adjudication constituted a PSF. Records received from BOP through counsel's FOIA request appear to be woefully incomplete, but it appears that the appeal was denied on August 12, 2020 because Mr. Gonzalez "did not attempt an informal resolution via informal resolution attempt (BP-8) form." While it is not reflected in the records received

---

[6]  Mr. Gonzalez's juvenile adjudication for Indecent Exposure is presently eligible for expungement under Colorado law. He has filed a petition to have the case expunged and is currently in a statutory waiting period. It is anticipated that the expungement order will be entered on or about October 15, 2020. It is unknown whether the expungement will alter BOP's designation of this as a PSF.

from BOP, Mr. Gonzalez has informed undersigned counsel that he has continued to pursue administrative remedies for waiving the PSF designation.

Regardless of whether Mr. Gonzalez has fully exhausted administrative remedies in the form of a final determination by BOP that he is ineligible for relief without the opportunity for further review, he has satisfied the exhaustion requirement. By the plain language of 18 U.S.C. § 3582(c)(1), a defendant may bring his motion upon "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." The record clearly establishes that Mr. Gonzalez made his initial request to the warden on April 23, 2020 and well in excess of 30 days has passed. Because Mr. Gonzalez remains incarcerated within BOP, that prong of the exhaustion requirement has been satisfied.

**B.     Mr. Gonzalez's high risk of suffering serious illness if infected with COVID-19 presents an extraordinary and exceptional circumstance that justifies compassionate release for Mr. Gonzalez.**

U.S.C. § 3582(c)(1) permits the court to modify the defendant's sentence if, "after considering the factors set forth in § 3553(a) to the extent that they are applicable," the court finds that "extraordinary and compelling reasons warrant such a reduction" and that "such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission." *Id*. § 3582(c)(1).

The statute's direct reference to U.S.S.C. policy statements suggests a framework for courts to consider in determining whether a particular defendant's

situation presents an extraordinary and compelling reason for a reduction in sentence. The applicable guideline, USSG § 1B1.13 (at Application Note 1) provides four circumstances in which "extraordinary and compelling" reasons will exist: (A) Medical Condition of the Defendant (B) Age of the Defendant. (C) Family Circumstances (D) Other Reasons.

Only subsection (D), "Other Reasons" is applicable to Mr. Gonzalez. This provision is applicable when "[a]s determined by the Director of the Bureau of Prisons, there exists in defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." While this provision by its terms would appear to apply only where the Director of BOP has invoked it, a majority of courts that have considered § 3582 as amended by the First Step Act have concluded that "the district court assumes the same discretion as the BOP director when it considers a compassionate release motion properly before it." *United States v. Perez,* No. 88-10094-1-JTM, 2020 WL 1180719, at *2 (D. Kan. March 11, 2020) (quoting *United States v. Brown,* No. 4:05-00227-1, 2019 WL 4922051m R *4 (S.D. Iowa Oct. 8, 2019). See also, this Court's order in *United States v. Erwin*, No. 15-cr-00383-RBJ, Doc. 331, p.6 (citing above authorities).

Therefore, this Court may decide for itself whether present circumstances constitute an "extraordinary and compelling reason" to reduce Mr. Gonzalez's

term of imprisonment. As set forth below, the combination of the ongoing COVID-19 pandemic and Mr. Gonzalez's underlying medical conditions presents an extraordinary and compelling reason for this Court to modify his sentence under § 3582(c)(1).

### 1. Inherent risks of incarceration during the COVID-19 pandemic

That the COVID-19 pandemic has had a serious and significant impact on all aspects of American life in 2020 is now axiomatic. Further, the fact that the virus is highly transmittable and potentially deadly has been so widely-discussed in political discourse, the media, and legal memoranda before this and other federal courts that it need not be discussed at length here. Mr. Gonzalez only points out that while months have passed since the crisis began, the virus continues to wreak havoc. As of the date of this filing, the United States counts at least 7,396,730 documented infections and 209,199 deaths from the virus[7]. At present, approximately 5,000 people per week are dying from the virus in the United States[8]. While the current state of the virus's devastation is shocking,

---

[7] United States Centers for Disease Control Data Tracker, https://covid.cdc.gov/covid-data-tracker/index.html#cases_casesinlast7days, (last accessed October 6, 2020).

[8] The CDC Data Tracker lists the 7-day moving average as of October 4, 2020 as 695 deaths per day, indicating a total of 4,865 reported COVID-19 deaths within the past 7 days.

most public health experts warn that in the coming fall months, it is likely to get worse[9], with CDC Director Robert Redfield indicating that the country could be facing "the worst fall, from a public health perspective, we've ever had[10]."

Similarly, courts have nearly universally recognized that by virtue of the very nature of the incarceration setting, inmates are and will continue to be extremely susceptible to contracting and transmitting the disease. Social distancing, strict hygienic measures and mask wearing in public spaces, particularly while indoors, have become our greatest defenses against contracting COVID-19. Unfortunately for individuals in our prison system, these protective measures are implausible or impossible. *See United States v. Lopez*, No. 19-cr-00429-WJM (D. Colo. Mar. 23, 2020) ("Social distancing is effectively an impossibility in jail."). The risk in prisons could be compared to that for individuals in nursing homes or long-term care facilities. "Correctional facilities— like cruise ships and long-term care facilities—simply are not designed for

---

[9] *Experts project autumn surge in coronavirus cases, with a peak after Election Day*, Achenbach and Weiner, Washington Post, September 5, 2020, https://www.washingtonpost.com/health/coronavirus-fall-projections-second-wave/2020/09/04/6edb3392-ed61-11ea-99a1-71343d03bc29_story.html (last accessed October 2, 2020.)

[10] CDC Director Warns This Fall Could Be The Worst Ever For Public Health, Treisman, NPR.org, August 13, 2020, https://www.npr.org/sections/coronavirus-live-updates/2020/08/13/902388083/cdc-director-warns-this-fall-could-be-the-worst-ever-for-public-health (last accessed October 2, 2020).

inmates to practice social distancing." *United States v. Jenkins*, 2020 WL 2466911 at 4 (D. Colo. May 8, 2020).

That the spread of the virus in federal prisons and jails is an ongoing problem is supported by a recent letter from Sens. Warren and Booker and Congressman Ted Deutch to the Director of the United States Marshals Service. In it, the authors point out that "reports suggest that USMS has not instituted the necessary protocols to contain the virus, including failing to implement widespread diagnostic testing of detained individuals in its custody. This means that, in some cases, '[i]nmates are NEVER tested for the Coronavirus disease until they reach a BOP facility,' according to The Council of Prison Locals, the union that represents BOP correctional staff[11]." Clearly, if detained individuals are arriving at BOP facilities such as FCI Englewood without ever having been tested, the USMS and BOP collectively have little or no ability to prevent such an individual from introducing the virus into new populations.

In spite of what may be considered "best efforts" by the BOP to take action to stop the spread of the virus, approximately 15,000 inmates and 2,000 staff

---

[11]

https://www.warren.senate.gov/imo/media/doc/2020.09.21%20Letter%20to%20US%20Marshals%20Service%20(USMS)%20re%20Prisoner%20Transport%20during%20COVID-19.pdf (September 21, 2020)(internal citations omitted).

have tested positive for COVID-19.[12]  Without evidence widespread testing, of which there is none, it is reasonable to conclude that these numbers vastly underrepresent the true spread of the virus through the BOP.

> **2.   Due to multiple comorbidities Mr. Gonzalez is at extreme risk of serious complications including death if he contracts the COVID-19 virus.**

Though only 38 years old, Mr. Gonzalez suffers from multiple chronic medical conditions that are known to place him at a greatly elevated risk of severe outcomes if he were to contract the virus.

> **a.   Obesity**

As of the drafting of the Presentence Report, Mr. Gonzalez was listed as 6'3" tall and 329 pounds, resulting in a BMI of 41.1.[13]  Any BMI greater than 30.0 is categorized as clinically obese, and those with a BMI greater than 35 are diagnosed with "Stage 2" obesity. Obesity is second only to age as a significant risk factor for contracting serious illness from COVID-19.[14]  A recent study found that clinically obese patients were 113% more likely than people of healthy

---

[12]  Per https://www.bop.gov/coronavirus/ (last accessed October 2, 2020).
[13] https://cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html

[14]  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#obesity; https://www.sciencemag.org/news/2020/09/why-covid-19-more-deadly-people-obesity-even-if-theyre-young

weight to land in the hospital, 74% more likely to be admitted to an ICU, and 48% more likely to die.[15]

Mr. Gonzalez has struggled with this dangerous condition for his entire adult life. Records from Salud Medical Center show that at a medical checkup on August 23, 2013, Mr. Gonzalez weighed 331 pounds (BMI 41.92) and was classified as "morbidly obese." Exhibit C, Salud Family Health Center records, pp. 1-2.

### b.    Diabetes

Mr. Gonzalez has carried a diagnosis of Type II Diabetes Mellitus since at least 2011. The earliest available records show that Mr. Gonzalez was seen for diabetes checkups and follow-ups in May, 2011 at Salud Family Health Center. Exhibit C, pp. 12-18. He was prescribed the diabetes medications Glyburide and Metformin. He continued treatment at Salud through August 2013 by which time he was prescribed daily insulin injections.

Unfortunately, Mr. Gonzalez's treatment for this condition over the years has been intermittent. He explains that this is a result of his family's financial condition, his lack of access to quality health insurance and routine care, and the high expense of diabetes medications and treatments. In February 2016 he was seen at Platte Valley Medical Center at which time his diabetes was

---

[15] https://onlinelibrary.wiley.com/doi/full/10.1111/obr.13128

"uncontrolled." Exhibit D, Platte Valley Medical Center records, p.1. He was again prescribed insulin injections which were observed to bring his blood sugar levels down "nicely."

More recently, at BOP Mr. Gonzalez had a 14-day intake medical appointment on December 13, 2019. Exhibit E, BOP Medical Records. Again he was diagnosed with Obesity as well as Type II Diabetes and observed to suffer from related peripheral neuropathy. He was prescribed insulin again as well as provided with diabetic shoes and a glucometer and lancets for measuring blood sugar levels. On May 7, 2020, Mr. Gonzalez was again seen by BOP Medical Services. To his credit, by this point he had lost 40 pounds. His BMI was 35.1 which was still classified as clinically obese. However, his blood sugar was reduced and he was able to discontinue insulin for the time being and continue monitoring using the glucometer. Exhibit F, BOP Medical Records. He was also diagnosed with essential hypertension (high blood pressure) and prescribed two medications – Hydrochlorothiazide and Lisinopril. The most recent BOP medical encounter shown in his records did not appear to address his diabetes.

Whether presently controlled or not, the CDC has indicated that people with type II diabetes like Mr. Gonzalez are at increased risk of serious illness

from COVID-19[16], and are approximately 3 times as likely to be hospitalized if they contract the disease.

### c.   Hypertension and Sleep Apnea

Mr. Gonzalez's long-term diagnosis of hypertension is reported throughout the available medical records. Exhibits C-F, generally. He is currently treated with two medications for this condition. Current CDC guidelines indicate that people with hypertension may be at an increased risk of serious illness from COVID-19[17].

Further, on March 10, 2020 Mr. Gonzalez was seen by BOP Medical Services and was screened for obstructive sleep apnea (OSA), a pulmonary/respiratory condition that causes the patient to essentially stop breathing for periods of time while sleeping. Exhibit G, BOP Medical Records. The screening instrument classified Mr. Gonzalez as "high risk" for OSA. He was scheduled to have a "sleep study" consult offsite, but due to the emergence of the COVID-19 crisis the ability to transport him out of the facility was lost and the sleep study has been postponed indefinitely. OSA is not presently listed by the

---

[16] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#diabetes

[17] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#serious-heart-conditions

CDC as a definitive risk factor for serious illness from COVID-19. However, several smaller studies have strongly indicated that this is the case, finding that as many as 28% of patients with serious illness from COVID-19 suffer from OSA[18].

Any one of Mr. Gonzalez's conditions would undoubtedly place him at an increased and unacceptable risk of serious complications from a COVID-19 infection. However, considered together these comorbidities put him in an extraordinary category of peril should he contract the virus. According to the CDC, an individual with a combination of three underlying medical conditions (obesity, diabetes, hypertension) is approximately **5 times as likely to be hospitalized** as an individual without these conditions[19]:

---

[18] https://www.pulmonologyadvisor.com/home/topics/obstructive-sleep-apnea-osa/obstructive-sleep-apnea-may-increase-risk-for-coronavirus-disease-2019/

[19] https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-underlying-medical-conditions.html



As stated by Judge Kane, "[t]hough not specifically contemplated as a ground for reducing a defendant's sentence under 18 U.S.C. § 3582(c), being at heightened risk of severe illness or death due to a world-halting pandemic certainly must amount to extraordinary and compelling reasons." *United States v. Jenkins*, 2020 U.S. Dist. LEXIS 86003, pp.14-15 (D. Colo., May 8, 2020).

3.   **The conditions of confinement at FCI Englewood are inadequate to protect Mr. Gonzalez from the significant risk that he might contract COVID-19 and suffer serious consequences including severe illness or death.**

Since the commencement of his BOP sentence on November 28, 2019, Mr. Gonzalez has been housed without interruption at the Federal Correctional Institution in Englewood, Colorado. While FCI-Englewood has not experienced

the worst of outbreaks among BOP facilities, the virus could hardly be said to be absent. As of the date of this motion, FCI-Englewood reports no active cases among staff or inmates but has had 7 inmates and 1 staff member test positive and recover[20]. However, the numbers posted on the BOP website must be viewed with some skepticism due to the lack of widespread testing among other factors.

Unlike most other BOP facilities FCI Englewood is attached to and associated with a Federal Prison Camp (FPC Englewood) and a Federal Detention Center (FDC Englewood). Between the FCI and the Camp, Englewood currently houses 916 inmates[21]. An unknown additional number reside at the FDC. Only 217 of the inmates at Englewood have had a test for the virus. According to a daily report from the Denver Division of the United States Marshal Service, there are currently 2 inmates at the Englewood complex who are positive for COVID-19, both of whom are BOP inmates. Exhibit H, *United States Marshal Service daily report*, October 1, 2020. These current positives are not reflected on the BOP's webpage, which is purportedly updated daily. In addition,

---

[20] https://www.bop.gov/coronavirus/

[21] https://www.bop.gov/locations/institutions/eng/

89 inmates are currently quarantined and classified as "potential cases." Of these, 41 reside at the FDC, 35 at the FCI, and 13 at the Camp.

The nature and connectedness of the three facilities also dictate that BOP's reported numbers may not always tell the whole story. Numerous employees move regularly among the three facilities, as do inmates on various work assignments or those participating in other programs, providing the potential for transmission from one facility to another. While BOP may report no active cases at FCI at a particular time, inmates at that facility are still clearly at risk whenever there are positive cases at FDC.

Mr. Gonzalez similarly reports that the procedures put in place to prevent transmission of the virus are nothing like the social distancing and other measures recommended by CDC. In his own words:

> "There are 10-man, 6-man, 4-man cubes and 2-man cells. The cells have bunk bed style racks, one desk and two lockers which leaves about 2ft of walk way (2-man cell). The Unit is separated by 3 ranges, North Range, Center Range and South Range. I am in a 2-man cell on south range, the ranges are closed off only by a gate (bars) each range comes out for 3 hours a day at set times, at the time that one range is out, inmates still go up to the bars of the other two ranges to communicate. We have a bathroom on our range 6 sinks, 4 toilets, 4 urinals (that are broken and leak urine on the floors) and 6 showers but only 3 of them work, I am housed on a range with 64 other inmates who all have to share this bathroom area, inmates who are on work detail go back and forth to work with inmates from other units, then come back to our range without being

checked. There is NO way of stopping infections from other ranges and/or units. At 5:30pm all the work detail from ALL the units on the compound go to rec together, then go back to their separate units, possibly spreading infections. The phones are not cleaned after every use, the computers are not cleaned at all. The C/O's come and go working doubles and triples sometimes working between the jail, the camp and the prison.

They have stopped the testing process because they don't have the money for the tests so they are sending inmates to quarantine for 21 days prior to their release, inmates from another range are orderlies to the quarantine range, and go in and out all day, in that process of quarantine, inmates are not allowed anything so they have no shower shoes (so they have to shower barefoot on the dirty shower floor), no hygiene until the provided some by the prison. One man went into quarantine and lost his leg due to an infection he got. Only the orderlies have access to the cleaning supplies and NO bleach is given out or used, only simple spray bottles with soap are used to spray things down with. We were given basic face masks when we were first locked down, and then again about 2 months ago. The masks along with the smoke in the air from the fires make breathing hard as it is. Some inmates as well as guards don't wear them at all."

Under these circumstances, Mr. Gonzalez's ability to exercise the precautions recommended by health experts to protect himself from the virus is unacceptably diminished.

**C.     The Court has the authority to reduce the length of Mr. Gonzalez's term of imprisonment and order him to serve a period of home confinement as a condition of supervised release.**

Mr. Gonzalez requests that the remainder of his two-year sentence be converted, by one means or another, to a term of home confinement. In this way, he could complete the punishment originally meted out by the Court while being in an environment where he can mitigate the risk of contracting COVID-19 by staying at home and isolating when necessary, practicing social distancing as recommended by public health experts, and having unfettered access to items such as face masks, hand soaps and sanitizers, disinfectants and other cleaning products, and personal protective equipment.

This Court does not have statutory authority to simply order that the balance of Mr. Gonzalez's sentence be served in home confinement. 18 U.S.C. § 3624(c)(2) grants the BOP with the exclusive authority to determine an inmate's place of confinement. "The CARES Act did not remove the exclusive authority of the BOP to designate the place of an inmate's confinement. The Attorney General — and by delegation the BOP — has exclusive authority and discretion to designate the place of an inmate's confinement." *United States v. Alvarez*, 2020 U.S. Dist. LEXIS 90444, at *6 (S.D. Fla. May 21, 2020), quoting *United States v. Phillips*, 2020 U.S. Dist. LEXIS 80299, 2020 WL 2219855, at *1. Counsel is unaware of any case in this District or elsewhere that has reached the opposite conclusion.

While the Court is not authorized to order that the remainder of Mr. Gonzalez's existing sentence be served on home confinement, § 3582(c)(1) does grant the Court discretion to modify the sentence to reduce the length of the term of imprisonment and/or to change or add conditions of supervised release. Further, even where the term of imprisonment on the original sentence was the result of a statutory mandatory minimum term, the Court is not bound by the mandatory minimum when considering whether to reduce a defendant's term of imprisonment. Rather, in the context of a compassionate-release motion, "the Court is permitted to consider whether the § 3553(a) factors warrant a lower sentence, even if the original sentencing judge could not." *United States v. Somerville*, 2020 U.S. Dist. LEXIS 93935, at *31-32 (W.D. Pa. May 29, 2020). *See also, United States v. Bess*, 2020 U.S. Dist. LEXIS 71056 at *11 (W.D.N.Y. April 22, 2020) ("This Court finds no indication in the text of section 3582(c)(1)(A) that courts are limited to offering compassionate release only to those inmates who have satisfied their statutory-minimum terms of incarceration.").

## IV.    The relevant § 3553(a) factors weigh in favor of reducing Mr. Gonzalez's sentence to time served and modifying the conditions of supervised release to require that he serve 10 months home confinement.

Mr. Gonzalez respectfully requests that the Court reduce his term of incarceration to "time served" and modify the conditions of his one year of

supervised release to require him to serve 10 months of home confinement. Such a sentence modification is appropriate and justified when considering the extraordinary and compelling reasons discussed above and the factors set forth at 18 U.S.C. § 3553(a).

### A. Nature and Circumstances of the Offense and History and Characteristics of Mr. Gonzalez

As noted above, Mr. Gonzalez's offense of conviction was Aggravated Identity Theft, an offense he committed in connection with a fraudulent scheme to obtain federal student loan funds. While any federal felony offense is by definition serious, in comparison to most offenses that come before this court it could not be considered aggravated in any way. The offense conduct, which is summarized in the PSI (Doc. 173, pp. 3-7), consisted of a scheme to fraudulently obtain student loan funds. For his part, Mr. Gonzalez illegally obtained PII from three employees at the company where he worked. That PII was later used to apply for student loans in the names of those individuals. Mr. Gonzalez also received student loan funds in his own name though he never intended to attend school. The amount of money Mr. Gonzalez received through the scheme was $10,383.70. Mr. Gonzalez was by no means the most culpable in the scheme (the PSI indicates that co-defendant Carmen Sanchez stipulated to having devised the scheme and that "most of the correspondence and debit cards that were received and used were mailed to [her] address." PSI, ¶19). Mr. Gonzalez

personally received and spent the smallest amount of money of all the co-defendants. PSI, ¶¶20-24. However, it appears that in part due to the mandatory sentence associated with the aggravated identity theft charge, Mr. Gonzalez received the longest sentence.

Mr. Gonzalez has always made his best efforts to make a positive contribution. He has maintained consistent employment and prior to his incarceration on this case he was employed for over 5 years with AMI Mechanical as a welder and pipefitter earning 20.50 per hour. PSI, ¶70. This employer wants Mr. Gonzalez back and has indicated that they will rehire him as soon as possible when he is released. Mr. Gonzalez's highest priority though is his family. He has been married to Sara Sanchez since 2018 but they have been together for over a decade and have a 9-year old son together, Izeyah. Mr. Gonzalez has also been essentially the sole father figure to Sara's 15-year-old son, Dominic, who has special needs and suffers from Type 1 diabetes and requires regular insulin treatment. Regrettably, Sara was a co-defendant in this case, but she was sentenced to three years of probation and was therefore able to continue to maintain the family's apartment in Thornton, though not without significant struggles in Mr. Gonzalez's absence.

Like his offense conduct, Mr. Gonzalez's criminal history may be concerning but is certainly not aggravated. The instant offense took place from

2012-14. He had no arrests or criminal charges from that time period until this case was filed in 2018. Prior to this case his most serious offenses took place when he was very young. His two felony convictions are for non-violent offenses: Conspiracy to Commit Theft (F5) in 2001 at age 18, and False Information to a Pawnbroker in 2003 at age 21. The only prior conviction that could be considered violent was a 3rd Degree Assault (misdemeanor) in 2002 at age 19. Mr. Gonzalez's Criminal History Category at the time of sentencing was CHC II, based on a total of three criminal history points.

Mr. Gonzalez's most serious transgressions, including his conduct in this case, are remote in time. His most serious prior criminal history prior to this case all occurred prior to 2009 when he became involved in his relationship (later marriage) with Sara Sanchez and undertook the responsibility of fatherhood. Given his current situation, Mr. Gonzalez seems unlikely to reoffend or to pose a danger to the community. His focus now is to be both a provider to his family and a good example to Dominic and Izeyah. He has a stable release plan that includes residing at the family's home in Thornton where he is able to self-isolate if and when necessary and resuming his employment at AMI Mechanical provided that he is able to safely do so.

    **B.**    **The need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the**

> **defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner**

Reducing Mr. Gonzalez's sentence to time served and modifying his conditions of Supervised Release to include 10 months of home confinement would be sufficient to serve the purposes of providing just punishment and promoting respect for the law. Prior to this case, Mr. Gonzalez had never been to prison. The Court's initial 24-month sentence made a great impression on him. Clearly it has also been financially and emotionally devastating to his family, particularly Izeyah who is a "daddy's boy" and has taken his father's absence very hard. PSI, Doc. 173, ¶61. Mr. Gonzalez is acutely aware of the fact this his own actions have caused this harm to his family and he is highly motivated to never let it happen again.

Mr. Gonzalez has served a significant portion of the Court's original sentence. He began serving the sentence by reporting to FCI Englewood on November 28, 2019. His projected release date is August 10, 2021 (See Exhibit A, BOP Inmate Locator information) for a total of 632 days. As of October 6, 2020, Mr. Gonzalez has served 314 days. He will cross the 50% threshold on October 8, 2020. A modified sentence to time served plus 10 months of home confinement would undoubtedly constitute just punishment in this case.

Similarly, the modified sentence proposed would afford adequate deterrence. As mentioned above, Mr. Gonzalez is already highly deterred from committing future offenses that would result in punishments that would disrupt his family life and his personal goals. In terms of general deterrence, the Court need only look to the co-defendants' cases to see that shorter sentences similar to the one now proposed were deemed to provide sufficient general deterrence.

Finally, more time in the incarceration setting is not necessary to provide Mr. Gonzalez with needed education or treatment. Mr. Gonzalez already had a GED before beginning his sentence. Since his arrival at Englewood, he has completed numerous educational programs including "21st Century Money Management," "First Civilizations," "Shakespeare," "Ancient Egypt," and "Re-Entry" I, II, and III. Exhibit B, pp. 13-14 (BOP Progress Report and Re-Entry Plan). He has remained employed as a Unit Orderly and has had no disciplinary infractions or other incidents. Unfortunately, due to the movement restrictions put in place to mitigate the risk of COVID transmission, the present opportunities for enrichment and employment have been greatly curtailed.

### C.    Other considerations

In weighing the proposed sentencing modification pursuant to § 3553(a), the Court should consider the absurdity of the situation with respect to Mr.

Gonzalez's juvenile adjudication for the Colorado misdemeanor of Indecent Exposure.

According to the PSI, this offense took place in February 1998 when Mr. Gonzalez was 15 years old. PSI, Doc. 173, § 41. The offense was a juvenile Class 2 Misdemeanor. Neither BOP nor anyone else can say precisely what happened because the "[t]he police report is no longer available due the age of the offense." *Id*. Further, it is clear that Mr. Gonzalez has not been arrested for, charged with, or convicted of any form of unlawful sexual behavior in the 22-1/2 years since. Nevertheless, BOP counselors have informed Mr. Gonzalez that because of this offense he has been assessed a "public safety factor" that dictates that *he can never qualify for a reduction in sentence in the form of an early transfer to home confinement through the BOP's internal procedures*. This was confirmed in an email to undersigned counsel by AUSA Paluch who wrote: "A Public Safety Factor of Sex Offender precludes your client from home confinement consideration, per the guidance from AG Barr. The amount of time passed from when a sex offense occurred does not negate the placement of the Public Safety Factor."

The fact that BOP is denying Mr. Gonzalez from even being considered for this critical form of relief based on a prior "sex offense" without regard to the fact that 1) the offense was a misdemeanor, 2) the offense was a juvenile

31

adjudication, 3) the offense took place more than 23 years ago, and 4) there are no documents available to indicate what the underlying facts were, is manifestly unjust. That a defendant who was similarly situated could be considered for placement in home confinement through BOP, but by virtue of this juvenile adjudication Mr. Gonzalez cannot, constitutes an unwarranted sentencing disparity. The Court should exercise the discretion Congress vested in it through the passage of the First Step Act to remedy this wrong.

## V.      Conclusion

Mr. Gonzalez's serious and substantial underlying medical conditions of obesity, diabetes, and hypertension combine to make him 5 times as likely to be hospitalized as the result of a COVID-19 infection. This greatly increased risk of serious complications coupled with the heightened risk of transmission of the disease in the incarceration setting constitute an extraordinary and compelling reason for this Court to exercise its discretion pursuant to 18 U.S.C. § 3582(c)(A)(1) to grant Mr. Gonzalez "compassionate release" through a reduction of his sentence. A reduction of Mr. Gonzalez's sentence to time served along with a modification of his conditions of release to add 10 months of home confinement would be consistent with the statutory sentencing objectives of 18 U.S.C. § 3553(a).

Respectfully Submitted,

s/Thomas R. Ward_____
**Thomas R. Ward**
Attorney for Defendant
McDermott Stuart & Ward LLP
140 E. 19th Ave., Suite 300
Denver, CO 80203
Tel. 303-832-8888
Fax 303-863-8888
tward@mswdenver.com

Dated:   October 6, 2020

_____

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on Tuesday, October 06, 2020, I electronically filed the

foregoing **MOTION FOR COMPASSIONATE RELEASE** with the Clerk of Court

using the CM/ECF system, which will automatically send notification of such filing

to all opposing counsel of record.


s/Thomas R. Ward
Thomas R. Ward