Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18-CR-00389-RBJ |
| Plaintiff, | **DECLARATION OF OFFICER THOMAS** |
| vs. | |
| 3.   JERAMYAH GONZALEZ, a/k/a JOSEPH PENA, a/k/a JOSEPH SANCHEZ | |
| Defendant. | |

## <u>DECLARATION OF OFFICER N. THOMAS</u>

I, Officer N. Thomas, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment, hereby declare as follows relating to the above-titled matter.

1.      I am the Executive Assistant at the Federal Bureau of Prisons ("Bureau") Federal Correctional Institution ("FCI") in Englewood, Colorado, known as "FCI Englewood."  I have been employed in this capacity since September 2019.  I have been employed by the Bureau in positions of increasing responsibility since July 2010.  In my role as Executive Assistant, I provide guidance, support, and direction to ensure overall compliance with Bureau policies, procedures and federal law.

2.      As part of my official job duties, I have access to records maintained in the ordinary course of business by the Bureau, including administrative remedy requests of federal inmates, records concerning the operation of FCI Englewood, information maintained in the

SENTRY[1] database, the Bureau Electronic Medical Record ("BEMR") database, and inmate central files.

3.      With respect to COVID-19 specifically, I am involved on a daily basis in the identification, planning, and implementation of all Bureau directives for preventing the spread of COVID-19 at FCI Englewood.  Through the course of my official duties, I have personal knowledge regarding the numerous measures, discussed in turn below, that have been implemented both Bureau-wide and at FCI Englewood in order to contain, mitigate, and manage the spread of COVID-19.

4.      The statements I make hereinafter are made based on my review of the official files and records of the Bureau, my own personal knowledge, or based on information acquired by me through the performance of my official duties.

5.      Inmates can apply for a reduction of sentence/compassionate release by writing the Warden in accordance with Program Statement 5050.50, *Compassionate Release/Reduction in Sentence*.[2] Ordinarily, inmates make their request via their Unit Team, to the Warden. Inmates can submit their request through a written request to staff form (cop-out), an electronic message through the TRULINCS system.  Due to the time-sensitive nature of these requests, FCI Englewood staff is processing the requests and informing inmates of the determination as soon as possible.

6.      Federal Inmate Jeramyah Gonzalez ("Inmate Gonzalez"), Register Number 44884-013, is currently incarcerated at FCI Englewood.  Attachment 1, Public Information

---

[1] SENTRY is the Bureau's national database which tracks various data regarding an inmate's confinement, including, but not limited to, an inmate's institutional history, sentencing information, program participation, administrative remedies, and discipline history.

[2] All public Bureau Program Statements can be accessed at https://www.bop.gov/PublicInfo/execute/policysearch?todo=query

Exhibit A

Inmate Data, at 1 (responsibility of "ENG").  Inmate Gonzalez is listed as a "Care 2" medical and "Care 1" for mental health, on a range of Care 1 – to – Care 4.  Attachment 2, Inmate Profile, at 2.  Inmate Gonzalez's request for a reduction in sentence based on COVID-19 concerns was denied by Warden Greilick on April 23, 2020.  Attachment 3, Denial Letter.

## I.  NATIONAL STEPS TAKEN BY BUREAU TO ADDRESS COVID-19[3]

7.  Before discussing the steps being taken at FCI Englewood specifically, I will first discuss the phases of the Bureau's national response to the COVID-19 pandemic, which apply generally across all BOP institutions.  As set forth below, the Bureau has taken—and is continuing to take—significant measures in response to the COVID-19 pandemic in order to protect the safety and security of all staff and inmates, as well as members of the public.

8.  In January 2020, the Bureau became aware of the first identified COVID-19 cases in the United States and quickly took steps to prevent its introduction and spread in Bureau institutions.  The Bureau's response has occurred over nine distinct "phases" to date.  The Bureau will continue to modify and adjust its response as circumstances change, and at the guidance and direction of worldwide health authorities.

### A.  Action Plan for COVID-19 – Phase One

9.  In January 2020, the Bureau began Phase One of its Action Plan for COVID-19.  Phase One activities included, among other things, seeking guidance from the BOP's Health Services Division regarding the COVID-19 disease and its symptoms, where in the United States infections were occurring, and the best practices to mitigate its transmission. *See*

---

[3] As illustrated below, the Bureau's national guidance has undergone a number of changes in response to the evolving threat.  The Bureau has established a COVID-19 resource section on its public webpage which is available at: https://www.bop.gov/coronavirus/.  This webpage includes updates on the Bureau's response to COVID-19 and positive COVID-19 tests among inmates and staff at Bureau institutions nationwide.

Exhibit A

https://www.bop.gov/resources/news/20200313_covid-19.jsp.  In addition, an agency task force was established to begin strategic planning for COVID-19 Bureau-wide.  This strategic planning included building on the Bureau's existing procedures for pandemics, such as implementing its pre-approved Pandemic Influenza Plan.  From January 2020 through the present, the Bureau has been coordinating its COVID-19 efforts with subject-matter experts both internal and external to the agency, including implementing guidance and directives from the World Health Organization (WHO), the Centers for Disease Control and Prevention (CDC), the Office of Personnel Management (OPM), the Department of Justice (DOJ), and the Office of the Vice President.  *See id.*

### B.     Action Plan for COVID-19 – Phase Two

10.     On March 13, 2020, the Bureau implemented "Phase Two" of its Action Plan. *See id.*  Phase Two put into place a number of restrictions across all Bureau facilities over a 30-day period, to be reevaluated upon the conclusion of that time period. Specifically, the Bureau suspended the following activities for a period of 30 days, with certain limited exceptions:

    a.   Social visits;[4]

    b.   Legal visits;

    c.   Inmate facility transfers;

    d.   Official staff travel;

    e.   Staff training;

    f.   Contractor access;

    g.   Volunteer visits; and

---

[4] To help ensure that inmates maintained social ties during this time, the BOP increased most inmates' telephone allotment to 500 minutes per month (from 300 minutes per month).  Since April 9, 2020, inmates are no longer charged to make telephone calls during the COVID-19 emergency.

h.   Tours.

11.      In addition, during Phase Two, inmates were subjected to new screening requirements.  Specifically, all newly arriving Bureau inmates were screened for COVID-19 symptoms and "exposure risk factors," including, for example, if the inmate had traveled from or through any high-risk COVID-19 locations (as determined by the CDC), or had had close contact with anyone testing positive for COVID-19.  Asymptomatic inmates with exposure risk factors were quarantined, and symptomatic inmates with exposure risk factors were isolated and evaluated for possible COVID-19 testing by local Bureau medical providers.[5]

12.      Staff were also subjected to enhanced health screening in areas of "sustained community transmission," as determined by the CDC, and at medical referral centers.  Colorado was designated a "sustained community transmission" state on March 19, 2020, and FCC Englewood implemented this enhanced screening for staff and contractors at that time.  The enhanced screening measures required all staff to self-report any symptoms consistent with COVID-19, as well as any known or suspected COVID-19 exposure, and further required all staff to have their temperature taken upon entry into any Bureau facility.

13.      Finally, in addition to the measures listed above, the Bureau implemented national "modified operations" in order to maximize social distancing within Bureau facilities.  These modifications included staggered meal times and staggered recreation times, for example, in order to limit congregate gatherings.  Additionally, the Bureau established a set of quarantine and isolation procedures for known or potential cases of COVID-19.

**C.      Action Plan for COVID-19 – Phase Three**

---

[5] Throughout this declaration, "isolation" refers to a symptomatic inmate being confined to a single cell within a designated housing unit or medical unit. "Quarantine," on the other hand, refers to asymptomatic inmates who may remain within their assigned housing units, together, but may not interact with staff or inmates outside of these housing units.

Exhibit A

14.     On March 18, 2020, the Bureau implemented Phase Three of the COVID-19

Action Plan for Bureau locations that perform administrative services (i.e., non-prison locations),

which followed DOJ, Office of Management and Budget, and OPM guidance for maximizing

telework.  In this phase, individuals who had the ability to telework and whose job functions did

not require them to be physically present were directed to begin teleworking.  *See*

https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf.

15.     Additionally, as part of this phase, and in accordance with the Pandemic Influenza

contingency plan, all cleaning, sanitation, and medical supplies were inventoried.  *See id.*

**D.     Action Plan for COVID-19 – Phase Four**

16.     On March 26, 2020, the Bureau implemented Phase Four of its Action Plan.  *See*

https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp.   In Phase Four, the

Bureau revised its preventative measures for all institutions.  Specifically, the agency updated its

quarantine and isolation procedures to require all newly admitted inmates to the Bureau, whether

in areas of sustained community transmission or not, to be assessed using a screening tool and

temperature check.  This screening tool and temperature check applied to all new intakes,

detainees, commitments, prisoners returned on writ from judicial proceedings, and parole

violators, regardless of their method of arrival.  Thus, all new arrivals to any Bureau institution—

even those who were asymptomatic—were placed in quarantine for a minimum of 14 days or

until cleared by medical staff.  Symptomatic inmates were placed in isolation until they tested

negative for COVID-19 or were cleared by medical staff as meeting CDC criteria for release

from isolation.

**E.     Action Plan for COVID-19 – Phase Five**

17.     On March 31, 2020, the Director of the Bureau ordered the implementation of

Phase 5 of its COVID-19 Action Plan, which took effect on April 1, 2020.  *See id.* Specifically, the Director ordered the following steps to be taken:

    a.  For a 14-day period, inmates in every institution will be secured in their assigned cells/quarters to decrease the spread of the virus.

    b.  During this time, to the extent practicable, inmates should still have access to programs and services that are offered under normal operating procedures, such as mental health treatment and education.

    c.  In addition, the Bureau is coordinating with the United States Marshals Service (USMS) to significantly decrease incoming movement during this time.

    d.  After 14 days, this decision will be reevaluated and a decision made as to whether or not to return to modified operations.

    e.  Limited group gathering will be afforded to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Computer System (TRULINCS[6]) access.

18.    On April 8, 2020, the Bureau's Director, M.D. Carvajal, issued a memorandum to the Bureau inmate population providing an update on actions taken by the Bureau up to that point.  Among other requests, inmates were asked to maintain clean housing areas, to wash their hands frequently, to avoid touching their faces, and to observe social distancing as much as practical.

**F.**    **Action Plan for COVID-19 – Phase Six**

19.    On April 13, 2020, the Director of the Bureau ordered the implementation of

---

[6] TRULINCS is the internal Bureau computer and electronic message platform that inmates use to communicate with staff in the institutions and individuals in the community.  Through this platform, inmates receive updates, notices, and can read inmate bulletins posted on the system by Bureau staff.

Phase 6 of its COVID-19 Action Plan.  *See*

https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf.

Specifically, the Director ordered an extension of "all measures from Phase 5, to include

enhanced modified operations for all institutions, until May 18, 2020."  *Id*.  The extension of the

modified operations for all Bureau institutions was continued to minimize inmate movement and

further decrease the spread of COVID-19.  Staff were directed to wash their hands frequently and

take other precautions, such as wearing gloves and masks, when interacting with inmates.

  **G.**  **Action Plan for COVID-19 – Phase Seven**

  20.  On May 18, 2020, the Director of the Bureau ordered the implementation of

Phase 7 of its COVID-19 Action Plan.  *See*

https://www.bop.gov/resources/news/20200520_covid-19_phase_seven.jsp.  Specifically, the

Director ordered the continuation of "its nationwide action plan as described in the Phase 6

Action Plain, to include measures to minimize movement and decrease the spread of the virus."

*Id*.  These restrictions remained in place through June 30, 2020, at which time the plan was

reevaluated.

  **H.**  **Action Plan for COVID-19 – Phase Eight**

  21.  On July 1, 2020, Phase 8 of the Bureau's COVID-19 Action Plan was

implemented, which continued all nationwide action as described in Phase 7.  Attachment 4,

Phase 8 Memo (June 30, 2020).  These restrictions remained in place until July 31, 2020, at

which time they were reevaluated.  *Id*.  Additionally, Phase 8 offered specific strategies to limit

possible COVID-19 exposure during court trips and movement between institutions, along with

enhanced intake procedures for individuals entering Bureau custody, among other protections.

  **I.**  **Action Plan for COVID-19 – Phase Nine**

Exhibit A

22.     On August 5, 2020, Phase 9 of the Bureau's COVID-19 Action Plan was implemented, which continued the measures contained in the Phase 8 memo, and added limitations on staff training and travel.  Attachment 5, Phase 9 Memo (August 5, 2020). Additionally, Phase 9 allows for in-person legal visits under certain circumstances and resumed certain forms of inmate programming, among other requirements.  *Id.* at 3.  Phase 9 has been extended twice, with the latest occurring on November 1, 2020, and the measures contained therein will remain in place "until further notice."  Attachment 6, Second Phase 9 Extension Memo (November 1, 2020).  Current modified operations plan also allows for social visits in specific circumstances, along with limited group gathering with extra attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. *See* https://www.bop.gov/coronavirus/covid19_status.jsp

### J.     Incident Command System

23.     In addition to the above phases of the Bureau's official Action Plan, on March 11, 2020, the Bureau activated its "Incident Command System," commonly referred to as a Command Center, at Central Office in Washington, D.C., in response to the COVID-19 pandemic.  *See* https://www.bop.gov/coronavirus/overview.jsp.  The Incident Command System is a standardized, all-hazard incident management tool.  The Bureau has used the Incident Command System in the past to address a number of other disruptive incidents, such as fires, human and animal disease outbreaks, and hazardous materials incidents.  The Incident Command System is structured in a manner that is intended to match the severity and complexity of the disruption for which it is activated.  Through the Incident Command System, the Bureau's National Command Center, in conjunction with local command centers, works to mitigate the health and safety risks of the COVID-19 pandemic incident by providing accurate information to

9

all Bureau institutions, holding Bureau institutions accountable for abiding by Bureau directives and guidance, and coordinating the Bureau's national response.

III.   **STEPS TAKEN AT FCI ENGLEWOOD TO ADDRESS COVID-19**

24.    In addition to the steps taken at the national level, FCI Englewood itself has also taken a number of additional measures in response to the COVID-19 pandemic.

   A.    **FCI Englewood Command Center**

25.    On March 13, 2020, FCI Englewood activated its local Command Center.  The local Command Center, in conjunction with the National Command Center, monitors, plans, and implements national directives and other procedures at FCI Englewood.

26.    In addition to the stay-in-shelter order and the special rules limiting inmate movement discussed above, FCI Englewood has taken many other steps to prevent the introduction and spread of COVID-19.  Those steps include providing inmate and staff education, conducting inmate and staff screening, implementing testing, quarantine, and isolation procedures, and ordering enhanced cleaning, testing, and medical supplies, among other preventative measures.

   B.    **Inmate and Staff Education relating to COVID-19**

27.    From the outset of the COVID-19 pandemic, FCI Englewood officials have provided regular updates to inmates and staff regarding the virus and the Bureau's response to the situation.  The officials have educated inmates and staff regarding measures that they themselves should take to stay healthy.

28.    Initially the Executive Staff—including the Warden, Associate Wardens, Executive Assistant and Captain—conducted town hall meetings and weekly rounds.  During these times, inmates received instruction about all aspects of COVID-19, including how to

identify symptoms, how to prevent the virus from spreading (including through good personal hygiene), and the need to immediately report symptoms to medical providers. These town hall meetings and weekly rounds started on April 1, 2020, and continued for approximately three weeks, until Executive Staff was instructed to minimize the number of staff coming into contact with the inmate population. Since the termination of the weekly town hall meetings and rounds, inmates and staff have been provided with bulletins, in both English and Spanish, which provide updated information.

29.     FCI Englewood staff have been also been educated about how to prevent the introduction and spread of COVID-19, including the importance of frequent hand washing, not touching their face, maintaining appropriate social distancing, and cleaning and disinfecting all equipment, including their uniforms.

**C.      Screening for COVID-19 at FCI Englewood**

30.     The following screening measures for both inmates and staff are currently in place and will remain in effect even after the stay-in-shelter order is lifted, until a determination has been made by Bureau officials that COVID-19 no longer poses a threat.

**1.      Inmates**

31.     FCI Englewood began screening incoming inmates for COVID-19 on March 19, 2020.

32.     Any inmate who may arrive at the FCI Englewood will be screened immediately upon their arrival. He will be met by medical providers from the Health Services Department. The medical providers will conduct an initial screening in a designated area separate from other staff and inmates. The medical providers will wear personal protective equipment, or "PPE," during the screening process. On May 28, staff at FCI Englewood started administrating

11

COVID-19 tests to all incoming inmates.

33.     The inmate will be evaluated for symptoms of COVID-19 (including fever, cough, and shortness of breath), as well as for "exposure risk factors," including whether the inmate has traveled from, or through, any locations identified by the CDC as increasing epidemiologic risk within the past 14 days, or has had close contact with anyone diagnosed with COVID-19 in the past 14 days.

34.     Following this initial screening, the inmate will be escorted to the unit in the institution that has been designated as the isolation/quarantine unit, where all staff are required to wear PPE.

35.     If the inmate does not have symptoms or risk factors, he will be automatically quarantined for 14 days to ensure that he does not develop any symptoms consistent with COVID-19.  If the inmate does have symptoms or risk factors, , he will be placed in an isolation cell.  In all areas of the quarantine/isolation unit, all staff must wear PPE and all inmates must wear a cloth facial covering.  Inmates on quarantine status and inmates on isolation are not celled together.  Their cells are in the same physical plant, though the air handlers have been adjusted to reduce the risk of air transfer between adjacent cells.

36.     After the expiration of 14 days, and upon medical clearance, an inmate may be released into the general population. Inmates must quarantine for 14 days. They receive a COVID test at the beginning of quarantine and a second after the 14th day. Upon receipt of the second negative, the inmate may be removed from quarantine.

37.     This process ensures that inmates are screened in a controlled environment, and that the rest of the inmate population is not exposed to a newly arrived inmate until he has been properly screened and cleared by Health Services Department medical providers.

12

38.     FCI Englewood has also taken steps to screen its current resident inmate population.

39.     The Health Services Department follows current CDC guidance in caring for individuals at FCI Englewood who are considered "high risk."  These guidelines can be found at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.  Per CDC guidance, "increased-risk" individuals include those over 65 and those with significant underlying medical conditions, such as chronic lung disease, moderate to severe asthma, liver disease, and diabetes.  *See id;* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

40.     FCI Englewood is also conducting enhanced screening for all inmates with ongoing work details, such as Food Service and cleaning orderlies, which are deemed to be essential functions.  Each inmate orderly is screened for illness before and after each assigned work detail, including screening for symptoms and having their temperature taken.  As a further precaution, most cleaning orderlies are assigned only to the units in which they reside, thus limiting their contact with inmates in other housing units.

41.     All inmates are encouraged to self-monitor and to report symptoms of illness to Englewood staff.  Inmates have multiple opportunities, every day, to speak with medical providers.  The Health Services Department, which is staffed with a full complement of medical providers, goes to each housing unit at least twice every day to conduct sick call and pill line.  In addition, unit staff and other department representatives (including staff from Education, Commissary, Psychology, and Recreation) are required to conduct daily rounds in each housing unit to ensure the inmate population remains safe and healthy.  An inmate can speak with any of these staff members, or he can bring his concerns to staff's attention by means of a written

13

request, or "cop-out."

42.　　FCI Englewood Health Services medical providers are prioritizing immediate

medical care for anyone who claims symptoms indicative of a COVID-19 infection.  An inmate

with symptoms consistent with COVID-19 will be evaluated by a medical provider in the Health

Services Department.  Based upon that evaluation, a determination will be made as to whether

quarantine and/or testing is appropriate.  If an inmate is deemed appropriate for quarantine, the

inmates in his housing unit will be quarantined for a period of the sooner of 14 days or pending

results of a COVID-19 test, if one is administered.

43.　　An inmate may also be placed in quarantine or isolation if he is exposed to a

person with COVID-19, where he will be monitored daily for a period of at least 14 days.

Quarantine or isolation will only be discontinued once a period of at least 14 days elapse without

the inmate's developing new symptoms. These inmates must also receive 2 tests.

44.　　On April 20, 2020, a mandatory daily temperature check of all FCI Englewood

inmates was instituted.   This daily temperature check was utilized for two weeks, with all results

coming back negative.  This process was implemented again on November 9, 2020 and

temperatures were taken twice daily.  Starting November 12 and continuing on to the date of this

submission, temperatures are once a day.

45.　　A specific medical provider has been assigned to each housing range and provides

care only to inmates on that range.  In addition, all other staff members are limited to an assigned

area of the prison to the greatest extent possible.

46.　　On April 16, 2020, all inmates who work for Federal Prison Industries, or

"Unicor," were moved to one housing unit.  Because these inmates work together at a designated

location, placing this group of inmates on one housing range reduces the risk of cross-

14

contamination.

### 2.     Staff and Visitors

47.     Since March 19, 2020, all individuals entering FCI Englewood institutions
(including staff, delivery drivers, or any other visitors) are directed to a single point of entry.
Every person entering the institution must undergo a health screening.  This includes having their
temperature taken and being asked a number of questions to evaluate their risk of exposure, as
well as to determine whether they have been experiencing any symptoms of illness.

48.     The persons conducting this health screening are authorized to deny entry to any
individual if he or she has a body temperature of 100 degrees Fahrenheit or above, or reports
other symptoms consistent with COVID-19.

49.     This screening applies to all staff and visitors, including those who leave the
grounds of FCI Englewood even for a short duration of time, such as a lunch break.

50.     FCI Englewood employees have also been educated on the importance of staying
home if they are feeling ill, and are required to self-report any COVID-19 exposure (known or
suspected) as well as any positive COVID-19 test.  If a staff member is tested for COVID-19,
they are not permitted to return to work until they have received the test results.

### D.     COVID-19 Testing at FCI Englewood

51.     At FCI Englewood, the decision whether to test an inmate for COVID-19 is made
by Bureau medical providers based on a number of criteria, including but not limited to: (1) the
nature and severity of the symptoms; (2) the inmate's potential exposure to COVID-19; and
(3) whether the inmate is considered "high-risk."

52.     To date, nineteen inmates have tested positive for COVID-19 facility-wide, with
thirteen staff testing positive.  Due to these positive tests, as a precaution, trained orderlies spray

housing units with HDQ2C, an approved cleaning solution, as well as a diluted Clorox solution. Quarantine units are sprayed twice daily; the non-quarantine units are sprayed once.

**E.      Additional Measures to Combat COVID-19.**

53.      All inmates have access to sinks, water, and soap at all times.  New inmates admitted to any institution at Englewood automatically receive soap, and all inmates may receive soap weekly.  For inmates without sufficient funds to purchase soap in the commissary, soap is provided at no cost to the inmate.  FCI Englewood inmates' clothing and linens are sent to be washed twice weekly

54.      All common areas in inmate housing units are cleaned at least once daily, and are typically cleaned by inmate orderlies multiple times throughout the day, with a designated disinfectant known to kill human coronavirus.  FCI Englewood has made this disinfectant available to all inmates so that they may clean their own living areas on a regular basis. Common areas outside inmate living areas, including the lobby, bathrooms, cafeteria, etc., are also cleaned with the same disinfectant on a daily basis, and often multiple times per day.

55.      Each housing unit has been stocked with cleaning supplies for use by inmate orderlies and other inmates to clean both the common areas and their individual housing areas on a daily basis.

56.      FCI Englewood has limited the number of in-person onsite staff meetings.  If such meetings take place, they are limited to 10 people and must be conducted in areas that allow individuals to maintain an appropriate distance from one another.

57.      Correctional staff are required to disinfect all common equipment, such as keys and radios, upon obtaining these items from the supply room and again upon their return.  Staff also have regular, consistent access to soap and hand sanitizer.

58.     Correctional staff have been provided protective equipment to be used in appropriate locations throughout Englewood such as quarantine areas, isolation units, and screening sites.  Englewood has sufficient PPE on hand, including N-95 respirator masks, surgical masks, and rubber gloves, to meet its current and anticipated needs.  It has the ability to order additional PPE should the need arise.

59.     On April 6, 2020, all inmates and staff were provided protective face masks.  At this point, every inmate received three masks that can be used multiple times.  On April 13, 2020, all inmates were issued cloth face coverings that were manufactured by Unicor at FCI Englewood.  Additional facial coverings, beyond the initial three, were issued to the inmate population on July 16, 2020, September 2020 and November 3, 2020.  All staff and inmates have been and will continue to be issued appropriate face coverings, and are required to wear the face covering when in public areas when social distancing cannot be achieved.

## V.    CONCLUSION

60.     In sum, the Bureau and FCI Englewood take the COVID-19 pandemic extremely seriously and have implemented numerous measures to proactively combat the spread of this disease to inmates and staff members.  The various phases of the Bureau's Action Plan have been designed and implemented in a careful and systematic manner both nationally and at FCI Englewood in order to mitigate the spread of COVID-19.

61.     In addition to the steps taken at the national level, FCI Englewood itself has taken a number of additional measures to prevent the introduction and spread of COVID-19 in the complex.

62.     The Bureau and FCI Englewood remain flexible in their ability to receive guidance from the CDC and other health organizations and to modify their actions to best

17

respond to the pandemic, according to the quickly shifting needs on the ground.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this ___20th___ day of November 2020, in Littleton, Colorado.

Officer Thomas
Executive Assistant
FCI Englewood
Federal Bureau of Prisons

Attachment 1, Public Information Inmate Data

Attachment 2, Inmate Profile

Attachment 3, Denial Letter.

Attachment 4, Phase 8 Memo (June 30, 2020).

Attachment 5, Phase 9 Memo (August 5, 2020)

Attachment 6, Second Phase 9 Extension Memo (November 1, 2020).

18

Exhibit A

Attachment 1

```
     FLMJF         *        PUBLIC INFORMATION       *    11-18-2020
   PAGE 001        *          INMATE DATA            *    14:11:35
                           AS OF 11-18-2020

REGNO..: 44884-013 NAME: GONZALEZ, JERAMYAH

                    RESP OF: ENG
                    PHONE..: 303-763-4300   FAX: 303-763-2553
                                            RACE/SEX...: WHITE / MALE
                                            AGE:  38
PROJ REL MT: GOOD CONDUCT TIME RELEASE      PAR ELIG DT: N/A
PROJ REL DT: 08-10-2021                     PAR HEAR DT:




   G0002      MORE PAGES TO FOLLOW . . .
```

Exhibit A

```
     FLMJF          *          PUBLIC INFORMATION          *     11-18-2020
     PAGE 002        *              INMATE DATA            *     14:11:35
                                AS OF 11-18-2020

     REGNO..: 44884-013 NAME: GONZALEZ, JERAMYAH

                        RESP OF: ENG
                        PHONE..: 303-763-4300    FAX: 303-763-2553
     HOME DETENTION ELIGIBILITY DATE: 05-30-2021

     THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.
     THE INMATE IS PROJECTED FOR RELEASE:  08-10-2021 VIA GCT REL

     ---------------------CURRENT JUDGMENT/WARRANT NO: 010 -----------------------

     COURT OF JURISDICTION..........: COLORADO
     DOCKET NUMBER..................: 1:18-CR-00389-RBJ-3
     JUDGE..........................: JACKSON
     DATE SENTENCED/PROBATION IMPOSED: 10-16-2019
     DATE COMMITTED.................: 11-28-2019
     HOW COMMITTED..................: US DISTRICT COURT COMMITMENT
     PROBATION IMPOSED..............: NO

                      FELONY ASSESS  MISDMNR ASSESS  FINES         COSTS
     NON-COMMITTED.: $100.00        $00.00          $00.00        $00.00

     RESTITUTION...:  PROPERTY:  NO  SERVICES:  NO       AMOUNT: $19,156.97

     ------------------------CURRENT OBLIGATION NO: 010 -------------------------
     OFFENSE CODE....: 160    18:1028 FRAUD IDENTITY THEFT
     OFF/CHG: 18:1028(A)(1): AGGRAVATED IDENTITY THEFT

      SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
      SENTENCE IMPOSED/TIME TO SERVE.:   24 MONTHS
      TERM OF SUPERVISION............:    1 YEARS
      DATE OF OFFENSE................: 05-31-2014

     G0002       MORE PAGES TO FOLLOW . . .
```

Exhibit A

```
      FLMJF        *          PUBLIC INFORMATION        *    11-18-2020
   PAGE 003 OF 003 *            INMATE DATA             *    14:11:35
                           AS OF 11-18-2020


   REGNO..: 44884-013 NAME: GONZALEZ, JERAMYAH

                       RESP OF: ENG
                       PHONE..: 303-763-4300   FAX: 303-763-2553
   ------------------------CURRENT COMPUTATION NO: 010 -------------------------

   COMPUTATION 010 WAS LAST UPDATED ON 12-02-2019 AT DSC AUTOMATICALLY
   COMPUTATION CERTIFIED ON 12-04-2019 BY DESIG/SENTENCE COMPUTATION CTR

   THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
   CURRENT COMPUTATION 010: 010 010

   DATE COMPUTATION BEGAN..........: 11-28-2019
   TOTAL TERM IN EFFECT............:    24 MONTHS
   TOTAL TERM IN EFFECT CONVERTED..:     2 YEARS
   EARLIEST DATE OF OFFENSE........: 05-31-2014

   JAIL CREDIT.....................:   FROM DATE     THRU DATE
                                       08-29-2018    08-29-2018

   TOTAL PRIOR CREDIT TIME.........: 1
   TOTAL INOPERATIVE TIME..........: 0
   TOTAL GCT EARNED AND PROJECTED..: 108
   TOTAL GCT EARNED................: 0
   STATUTORY RELEASE DATE PROJECTED: 08-10-2021
   ELDERLY OFFENDER TWO THIRDS DATE: 03-28-2021
   EXPIRATION FULL TERM DATE.......: 11-26-2021
   TIME SERVED.....................:    11 MONTHS    23 DAYS
   PERCENTAGE OF FULL TERM SERVED..:  48.9
   PERCENT OF STATUTORY TERM SERVED:  57.4

   PROJECTED SATISFACTION DATE.....: 08-10-2021
   PROJECTED SATISFACTION METHOD...: GCT REL




   G0000        TRANSACTION SUCCESSFULLY COMPLETED
```

Exhibit A

Attachment 2

```
     FLMJF  535.03 *              INMATE PROFILE              *     11-18-2020
     PAGE 001                                                       14:13:18
            44884-013              REG
REGNO: 44884-013               FUNCTION: PRT DOB/AGE.: ███████  / 38
NAME.: GONZALEZ, JERAMYAH                    R/S/ETH.: W/M/O    WALSH: NO
RSP..: ENG-ENGLEWOOD FCI                     MILEAGE.: 22 MILES
PHONE: 303-763-4300        FAX: 303-763-2553
 PROJ REL METHOD: GOOD CONDUCT TIME RELEASE   FBI NO..: ████████
 PROJ REL DATE..: 08-10-2021                  INS NO..:
 PAR ELIG DATE..: N/A                         SSN.....: ████████
 PAR HEAR DATE..:              PSYCH: NO      DETAINER: NO        CMC..: NO
OFFN/CHG RMKS: 1:18-CR-00389-RBJ-3 AGGRAVATED IDENTITY THEFT
OFFN/CHG RMKS: 24 MOS/1 YR SRT
    FACL CATEGORY  - - - - CURRENT ASSIGNMENT - - - - - EFF DATE  TIME
    ENG  ADM-REL   A-DES      DESIGNATED, AT ASSIGNED FACIL 11-28-2019 1129
    ENG  CARE LEVEL CARE1-MH  CARE1-MENTAL HEALTH        12-10-2019 1027
    ENG  CARE LEVEL CARE2     STABLE, CHRONIC CARE       12-02-2019 1043
    ENG  COR COUNSL CCC UW    K. MORGAN, EXT 1393        11-28-2019 1129
    ENG  CASE MGT   BIR CERT N BIRTH CERTIFICATE - NO    12-17-2019 1020
    ENG  CASE MGT   DEPEND Y   DEPENDENTS UNDER 21 - YES 12-17-2019 1020
    ENG  CASE MGT   PHOTO ID Y PHOTO ID - YES            12-23-2019 1054
    ENG  CASE MGT   RPP PART   RELEASE PREP PGM PARTICIPATES 02-18-2020 1351
    ENG  CASE MGT   SO NOTIF Y SEX OFFENDER NOTIFIED - YES 12-17-2019 1020
    ENG  CASE MGT   SSN CARD N SOCIAL SECURITY CARD - NO 12-17-2019 1020
    ENG  CASE MGT   VET P/S N  PARENT/SPOUSE VETERAN - NO 12-17-2019 1020
    ENG  CASE MGT   VETERAN N  VETERAN - NO              12-17-2019 1020
    ENG  CASE MGT   VWP AUTO   VICTIM/WITNESS PGM AUTO UPDATE 10-19-2019 0645
    ENG  CASE MGT   V94 COA913 V94 CURR OTHER ON/AFTER 91394 12-10-2019 0852
    ENG  CASE MGT   V94 PV     V94 PAST VIOLENCE         12-10-2019 0851
    ENG  CASE MGT   WA NOT CER WALSH ACT-NOT CERTIFIED   02-27-2020 0845
    ENG  CASE MGT   WA W CONV  WALSH ACT HIST WITH CONVICTION 10-18-2019 1429
    ENG  COMM CORR  INST TRANS INSTITUTION TRANSFER      08-31-2020 1520
    ENG  CASEWORKER CSW UW     R. FRENCH EXT. 1389       11-28-2019 1129
    ENG  CUSTODY    IN         IN CUSTODY                10-18-2019 1421
    ENG  DRUG PGMS  ED NONE    DRUG EDUCATION NONE       12-10-2019 0853
    ENG  DESIG/SENT ALPHA      TEAM ALPHA                10-18-2019 1423
    ENG  DESIG/SENT FCO YES    FCO-FULLY COMPLIED W/JUD REC 11-13-2019 1235
    ENG  DESTNATION CPH 7NP    SOUTH FEDERAL FACILITY DENVER 05-27-2021 1426
    ENG  EDUC INFO  ESL HAS    ENGLISH PROFICIENT        01-07-2019 1130
    ENG  EDUC INFO  GED HAS    COMPLETED GED OR HS DIPLOMA 01-31-2020 0900
    ENG  FIN RESP   PART       FINANC RESP-PARTICIPATES  12-10-2019 0859
    ENG  FIRST STEP FTC INELIG FTC-INELIGIBLE-REVIEWED   06-16-2020 1216
    ENG  FIRST STEP N-ANGER Y  NEED - ANGER/HOSTILITY YES 12-04-2019 0736
    ENG  FIRST STEP N-ANTISO Y NEED - ANTISOCIAL PEERS YES 12-04-2019 1309
    ENG  FIRST STEP N-COGNTV Y NEED - COGNITIONS YES     12-04-2019 1309
    ENG  FIRST STEP N-DYSLEX N NEED - DYSLEXIA NO        09-03-2020 0736
    ENG  FIRST STEP N-FIN PV Y NEED - FINANCE/POVERTY YES 09-22-2020 0857
    ENG  FIRST STEP N-M HLTH N NEED - MENTAL HEALTH NO   07-24-2020 2200
    ENG  FIRST STEP N-MEDICL Y NEED - MEDICAL YES        09-21-2020 1431
    ENG  FIRST STEP N-RLF Y    NEED - REC/LEISURE/FITNESS YES 10-01-2020 1413
    ENG  FIRST STEP N-TRAUMA N NEED - TRAUMA NO          12-04-2019 1309
    ENG  FIRST STEP N-WORK N   NEED - WORK NO            07-24-2020 0921

G0017     WARNING : NOTIFICATIONS ARE REQUIRED PER P.S. 1490.06
G0002     MORE PAGES TO FOLLOW . . .
```

Exhibit A

```
   FLMJF  535.03 *              INMATE PROFILE              *     11-18-2020
PAGE 002 OF 002                                                   14:13:18
           44884-013             REG
REGNO: 44884-013              FUNCTION: PRT DOB/AGE.: 08-28-1982 / 38
NAME.: GONZALEZ, JERAMYAH                     R/S/ETH.: W/M/O     WALSH: NO
RSP..: ENG-ENGLEWOOD FCI                      MILEAGE.: 22 MILES
PHONE: 303-763-4300        FAX: 303-763-2553
   FACL CATEGORY  - - - - - CURRENT ASSIGNMENT - - - - - - EFF DATE  TIME
   ENG  FIRST STEP R-LW      LOW RISK RECIDIVISM LEVEL    06-16-2020 1220
   ENG  LEVEL      LOW       SECURITY CLASSIFICATION LOW  10-18-2019 1538
   ENG  MED DY ST  NO PAPER  NO PAPER MEDICAL RECORD      12-02-2019 1042
   ENG  MED DY ST  REG DUTY  NO MEDICAL RESTR--REGULAR DUTY 12-02-2019 1042
   ENG  MED DY ST  SOFT SHOES SOFT SHOES ONLY             09-21-2020 1301
   ENG  MED DY ST  YES F/S   CLEARED FOR FOOD SERVICE     12-02-2019 1042
   ENG  PGM REVIEW DEC       DECEMBER PROGRAM REVIEW      12-09-2020 1121
   ENG  PSYCH TRMT SOM NR D  SEX OFF TRMT NON-RES DECLINE 12-10-2019 1012
   ENG  QUARTERS   W12-084L  HOUSE W/RANGE 12/BED 084L    08-13-2020 1103
   ENG  RELIGION   MOORISH   MOORISH SCIENCE TEMPLE       07-14-2020 1156
   ENG  UNIT       WEST      C. KIZZIER, EXT 1397         11-28-2019 1129
   ENG  WAITNG LST A&O YES   A&O COMPLETE                 12-05-2019 1505
   ENG  WAITNG LST CRIMINAL  CRIMINAL THINKING            03-27-2020 0856
   ENG  WAITNG LST RPP 1     MEN'S HEALTH & NUTRITION     12-10-2019 0852
   ENG  WAITNG LST RPP 2     EMPLOYMENT                   12-10-2019 0852
   ENG  WAITNG LST RPP 3     PERSONAL FINANCE             12-10-2019 0852
   ENG  WAITNG LST RPP 4&5   RLS SEMINAR                  12-10-2019 0852
   ENG  WAITNG LST RPP 6     PERSONAL GROWTH & DEVELOPMENT 12-10-2019 0852
   ENG  WRK DETAIL UW ORDERLY UW ORDERLY                  04-30-2020 0001




   G0017      WARNING : NOTIFICATIONS ARE REQUIRED PER P.S. 1490.06
   G0000      TRANSACTION SUCCESSFULLY COMPLETED
```

Exhibit A

Attachment 3

INMATE GONZALEZ, Jeramyah
Reg. No. 44884-013
Unit West Upper


INMATE REQUEST TO STAFF MEMBER

You requested a reduction in sentence (RIS) based on concerns
about COVID-19.  After careful consideration, your request is
denied.

Title 18 of the United States Code, section 3582(c)(1)(A),
allows a sentencing court, on motion of the Director of the BOP,
to reduce a term of imprisonment for extraordinary or compelling
reasons.  BOP Program Statement No. 5050.50, Compassionate
Release/Reduction in Sentence: Procedures for Implementation of
18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), provides guidance on the
types of circumstances that present extraordinary or compelling
reasons, such as the inmate's terminal medical condition;
debilitated medical condition; status as a "new law" elderly
inmate, an elderly inmate with medical conditions, or an "other
elderly inmate"; the death or incapacitation of the family
member caregiver of the inmate's child; or the incapacitation of
the inmate's spouse or registered partner.  Your request has
been evaluated consistent with this general guidance.

The BOP is taking extraordinary measures to contain the spread
of COVID-19 and treat any affected inmates.  We recognize that
you, like all of us, have legitimate concerns and fears about
the spread and effects of the virus.  However, your concern
about being potentially exposed to, or possibly contracting,
COVID-19 does not currently warrant an early release from your
sentence.  Accordingly, your RIS request is denied at this time.

If you are not satisfied with this response to your request, you
may commence an appeal of this decision via the administrative
remedy process by submitting your concerns on the appropriate
form (BP-9) within 20 days of the receipt of this response.


_____                    4/23/2020
B. Greilick, Warden                                 Date

Exhibit A

Attachment 4



**U.S. Department of Justice**
**Federal Bureau of Prisons**

_Washington, D.C. 20534_

June 30, 2020

**MEMORANDUM FOR ALL CHIEF EXECUTIVE OFFICERS**

**FROM:**     **ANDRE MATEVOUSIAN, ASSISTANT DIRECTOR**
**CORRECTIONAL PROGRAMS DIVISION**

NICOLE       Digitally signed by NICOLE ENGLISH
ENGLISH      Date: 2020.06.30 14:40:26 -04'00'

**N. C. ENGLISH, ASSISTANT DIRECTOR**
**HEALTH SERVICES DIVISION**

**SUBJECT:**     **CORONAVIRUS (COVID-19) PHASE EIGHT ACTION PLAN**

This memorandum describes the Bureau's (BOP) Coronavirus (COVID-19) Phase Eight Action Plan, which includes an extension of previously disseminated guidance along with new measures to implement in the management of the pandemic.

## EXTENSION OF PHASE SEVEN ACTION PLAN:

Effective Wednesday, July 1, 2020, the BOP will continue its nationwide action as described in the Phase Seven Action Plan. These restrictions will remain in place through July 31, 2020, at which time the plan will be reevaluated.

## COURT TRIPS:

A number of variables affect the risk of COVID-19 transmission during in-person court appearances and will determine some of the specific management strategies that are needed at each location. The U.S. Marshals Service (USMS) takes responsibility for the inmate once they leave the BOP institution until their return. Each USMS district may have their own procedures. Individual courts may also have different COVID mitigation procedures and requirements. Knowing the likelihood of BOP inmates mixing with non-quarantined, Non-BOP inmates while in USMS custody during a court visit is essential to determine the risk of COVID-19 exposure. The frequency of an inmate's court appearance and the number of inmates going to a court at any one time are also important factors to consider. It is recommended that each BOP detention center contact the USMS and the court to ascertain their COVID-19 mitigation procedures and consult with Regional Health Services staff on developing an individualized strategy. The following are general principles to follow:

Exhibit A

- Inmates in COVID isolation should not have in-person court appearances unless absolutely necessary. Strongly consider the inmate appearing via telephone hearing. If a VTC is accessible, that can also be used as an alternative.

- Inmates in COVID quarantine (intake/exposure) should delay in-person court appearances until they are COVID tested at the end of quarantine. It is recommended that VTC or telephone appearances be used as alternatives. In general, testing an inmate immediately before or after a court visit would have little utility and is not recommended. However, Abbott ID NOW tests can be used on a case-by-case basis, especially if a visit is required by the court.

- Inmates should wear face coverings and perform hand hygiene just before departure from and upon return to the institution.

- BOP officials should request that BOP inmates be cohorted only within their own housing or quarantine cohort and not be mixed with inmates from other housing units or other institutions, or transported with inmates from other institutions to the extent possible while at court.

- Upon return to the detention center, inmates should be quarantined if they were outside of the institution and were exposed to inmates from other housing units or locations (e.g., county jails). Periodic testing of inmates with frequent court appearances should be considered. The 14-day quarantine period must be restarted for any inmate who is in close contact with other inmates not from their housing unit or location.

## INTAKES:

As we return to a more normalized inmate movement, the quarantine site model will no longer be utilized. All inmates entering an institution will require enhanced intake procedures:

- Institutions are to designate specific quarantine and isolation areas in advance with capacity numbers commensurate with anticipated levels and frequency of incoming inmates. Ideally, inmates should be quarantined or isolated in single-cell, if possible. When cohorting is necessary, the best practice is to keep cohorted inmates together and not add to the cohort when new intakes arrive.

  New intakes should undergo the same previously described intake screening process with symptom and temperature screening. Inmates will be tested on arrival with an approved viral PCR test from a nasopharyngeal swab using either an Abbott ID Now POC test or commercial send out lab test.
  - o Inmates that test positive and/or are symptomatic will be placed immediately in isolation. They will remain in Isolation until they meet the CDC test-based strategy criteria for isolation release which includes two negative tests at least 24 hours apart, the first may be performed with either Abbott ID POC or commercial lab test, but second must be commercial lab test.

  - o Inmates that are asymptomatic and test negative are placed in quarantine. They will remain in quarantine until:

- They become symptomatic during the quarantine period.  These inmates should be tested (Abbott or commercial) and placed in Isolation immediately. Depending on the housing circumstances, potential contacts (e.g. cellmate, cohort, housing unit) will need to reset their quarantine.  When risk of exposure and/ or spread of transmission is higher, re-testing of potential contacts could be considered.  A testing frequency of every 3 to 4 days is preferred whenever feasible in consultation with Regional Infection Prevention and Control Consultant and the Regional Medical Director.

- On or after 14 days.  The inmates that have remained asymptomatic will be tested with a commercial lab test.  Inmates should remain in quarantine status until test results are complete.  If the test is positive, see above bullet. If the test is negative, the inmate may be released to General Population.

## MOVEMENT:

Movement of inmates between BOP institutions can be a simple, short-distance transfer between two institutions or a complex, multi-day, multi-institution process.  When a planned movement involves multiple stops, staff and agencies, and potential mixing with other inmate groups from other BOP facilities or other correctional jurisdictions, the risk of COVID-19 exposure and transmission increases. Refer to the HSD Guidance (6/19/20) for Inmates who are transferring or Releasing from a BOP Facility, https://sallyport.bop.gov/co/hsd/infectious_disease/covid19/docs/guidance_for%20_transferring_or%20releasing%20inmates_20200619.pdf

- As inmate movement operations move toward "normalizing", the number and complexity of inmate moves will increase.  This process of normalizing should be done in a measured approach to allow institutions, regions and the agency develop best practices moving forward.

- Institutions/ Regions should evaluate their space and staffing resources to accommodate increased numbers of the various types of quarantine inmate groups (intake, exposed and pre-release) as well as isolation inmates in various stages of the process.  Moving to a test out strategy for discontinuation of isolation may prolong isolation for various groups of inmates longer than 14 days.  Various and/or large groups of quarantine and isolation inmates may require a re-distribution of inmates amongst institutions within a region.

- The first step in ensuring safe inmate movement is a full test-in/out, 14-day pre-release quarantine of transferring inmates prior to transport.

  o Planning an inmate move should occur with enough time in advance to allow for a full test in/out 14-day quarantine and turnaround time for test results (21 days).

  o Planning should be coordinated with all the institutions involved from the beginning stages so that setting of dates will allow for the above process to occur for all the potential inmates on that move.

o Inmates who have tested negative at the completion of their quarantine should stay in quarantine status until they are transferred, preferably within 5 days of the negative result, but may still move within 14 days of the negative result.

o If an inmate develops symptoms and/or tests positive, they will not be permitted to travel until they have met the CDC test-based criteria for test-based release from isolation. On rare occasions, there may be exceptions where an inmate must travel prior to the completion of this process or even with a positive result (e.g. court ordered transfer). In these cases, the transfer must be discussed and approved by local executive staff from the institutions and regions involved with input from health services staff, as needed.

o For inmates who have previously tested positive for COVID-19: (refer to https://sallyport.bop.gov/co/hsd/infectious_disease/covid19/docs/covid19_testing_exp anded_inmate_testing_strategies_2020619.pdf)

   ▪ If they cleared isolation using the CDC test-based strategy more than 14 days prior to travel date, they will need one negative commercial viral lab test completed prior to travel and do not need any further testing or quarantine prior to transfer

   ▪ If they cleared isolation using a symptom or time-based strategy, they will need one negative commercial viral lab test completed prior to travel and do not need further testing or quarantine prior to transfer.

   ▪ If the test is positive, they cannot travel and must be placed in isolation until they meet the test-based criteria with two negative tests at least 24 hours apart. The first may be performed with either Abbott ID POC or commercial lab test, but second must be commercial lab test.

• Planning of inmate movement should be coordinated with close involvement of local Executive Staff, CMC, Unit Team and Health Services staff from all involved institutions/regions and transport agencies. Communication and accurate information are vital to ensure a proposed inmate movement has minimized any potential risk of COVID-19 exposure/transmission.

• To the extent possible, manifests should be generated that allow for appropriate social distancing during transport (e.g. loading a bus/ plane at 50% capacity).

• "Normal" transport routes and schedules will need to be reviewed and reconsidered. Inmate movement should be coordinated in a manner that:

   o **Has minimal stops/holdovers:** e.g. consider institutions meeting at a halfway point to pick-up inmates rather than having multiple stops and holdovers.

- o **Minimizes the amount of time inmates are held in holdover:** the longer an inmate spends in transit, the greater the risk. The frequency of certain drop offs/pick-ups may need to be increased to minimize holdover times.

- o **Avoids mixing of inmate groups** as much as possible:

  - The following Inmate group terms will be defined as follows:

    - **BOP group** - inmates who have completed a full test in/out pre-release/ transfer quarantine process prior to transfer from a BOP facility.

    - **Non-BOP group** - inmates from other agency/correctional jurisdiction who have not undergone a full test in/out quarantine.

  - Maximize runs with only BOP groups; make every effort to coordinate runs for Non-BOP groups separately.

  - There are many scenarios where mixing of BOP groups from different BOP institutions is unavoidable. If all BOP-groups have been properly tested in/out of a pre-release/transfer quarantine just prior to transport at their sending institution, this practice is acceptable.

  - Ideally, any Non-BOP group during a transfer will have been tested for COVID-19 prior to transport. However, this is often not possible or verifiable. All Non-BOP group inmates must have a temperature check and symptom screen immediately prior to transport. Anyone with a known positive COVID-19 test or who has fever or symptoms will not be admitted on the transport.

  - If a BOP group is mixed with a Non-BOP group at any point in the transfer process, all the inmates in that group will require intake screening, testing and intake quarantine (asymptomatic) or isolation (symptomatic) at their destination institution.

- During transport, BOP-group inmates should wear at least facial coverings and staff should wear at least facial covering and gloves. For transport of Non-BOP or mixed groups, inmates should wear surgical masks and staff should wear surgical masks and gloves during transport and add gown and eye protection with direct contact.

- Documentation on the BEMR exit summary/transfer paperwork (e.g. In-Transit Form) needs to include results of the same-day symptom screen and temperature check, the most recent COVID-19 test result, and the inmate's COVID-19 history. To ensure proper documentation of negative COVID-19 testing from a commercial lab is displayed on the exit summary, the BOP ICD code of Z03818-c19 will need to be added to the inmate's health problem list. This will then display properly upon the inmate Exit Summary. The BEMR Exit Summary/transfer paperwork

should be provided to the bus LT/USMS to verify that a commercial lab test has been completed with a negative test result.

- **Holdover Sites/Bus Hubs:**

  o Holdover/Bus hub sites should designate specific holdover quarantine areas in advance in numbers commensurate with anticipated levels and frequency of incoming inmates.

  o For BOP group transfers that have not mixed with Non-BOP groups and require holdover at a facility, the BOP groups can generally be placed directly into a holdover unit setting without a test in/out process and do not need to complete a full 14-day quarantine prior to moving on to their next destination.

  o These holdover groups should be housed separately from the new intake, post-exposure and prior to release/transfer* quarantine groups at that institution.
  *Note there is a distinction between inmates coming from another institution in holdover status waiting to "transfer"/continue on to their next destination versus. inmates that are originating from the holdover site and waiting to transfer.

  o The various holdover groups may be housed together, if necessary.

  o If a holdover site/bus hub is known to receive Non-BOP groups, they should consider having designated quarantine/isolation units for them and manage them as new intakes.

    ▪ Those that are symptomatic and/or test positive must be placed in isolation and can be released after meeting CDC test-based criteria for release from isolation into general population or transfer. If transfer is to occur after 14 days from their release from isolation, they will need one negative commercial viral lab test completed prior to travel. They do not need any further quarantine prior to transfer.
    ▪ Those that are asymptomatic and test negative will be placed in quarantine. When they complete quarantine and test-out:

      o For those inmates that are expected to remain at the holdover site for a prolonged period of time, they can be released to General Population. If they are released to General Population, future transfers will require pre-transfer test-in/test-out quarantine.

      o For those inmates expected to transfer within a reasonable period of time, they should remain in quarantine until their transfer date. They should transfer within 14 days of the test-out negative result or be re-tested prior to transfer.

Exhibit A

- If a holdover site/bus hub receives a mixed group of BOP and Non-BOP groups or BOP group that has previously mixed with a Non-BOP group, they must now all be managed as a Non-BOP group.

## DESIGNATED (FINAL RECEIVING) INSTITUTIONS:

Transferred inmates will undergo the same process as a new intake, to include intake screen and temperature check, COVID-19 testing and isolation versus new intake quarantine at the final designated facility.

## QUESTIONS:

If staff have questions about COVID-19, they may reach out to the agency at the following email box: COVID19Questions@bop.gov.

We appreciate your assistance as we continue to work collaboratively to mitigate the transmission of COVID-19 within our prisons nationwide, and with all phases of our COVID-19 response.

Exhibit A

Attachment 5



**U.S. Department of Justice**
**Federal Bureau of Prisons**

_Washington, D.C. 20534_

August 5, 2020

**MEMORANDUM FOR ALL CHIEF EXECUTIVE OFFICERS**

**FROM:**      **ANDRE MATEVOUSIAN, ASSISTANT DIRECTOR**
**CORRECTIONAL PROGRAMS DIVISION**

**L. CRISTINA GRIFFITH, ASSISTANT DIRECTOR**
**HUMAN RESOURCE MANAGEMENT DIVISION**   LINELL GRIFFITH   Digitally signed by LINELL GRIFFITH Date: 2020.08.05 08:36:50 -04'00'

**N. C. ENGLISH, ASSISTANT DIRECTOR** NICOLE ENGLISH Digitally signed by NICOLE ENGLISH Date: 2020.08.05 08:22:21 -04'00'
**HEALTH SERVICES DIVISION**

**SUBJECT:**      **CORONAVIRUS (COVID-19) PHASE NINE ACTION PLAN**

This memorandum describes the Bureau's (BOP) Coronavirus (COVID-19) Phase Nine Action Plan, which includes an extension of previously disseminated guidance along with new measures to implement in the management of the pandemic.

## EXTENSION OF PHASE EIGHT ACTION PLAN

The BOP will continue its nationwide action as described in previous phase memorandums. These measures will remain in place through August 31, 2020, at which time the plan will be evaluated.

## STAFF TRAINING

All in-person training is suspended through August 31, 2020. Exceptions to in-person training includes: ICT I, ICT II, completion of mandatory requirements for Annual Training, OSHA mandated certifications, and any training that can be conducted remotely to fulfill ongoing mandatory credentialing requirements that cannot be waived. Any other exceptions to this suspension must be routed through the appropriate Assistant Director or Regional Director, and submitted to the Deputy Director for final approval.

## STAFF TRAVEL

All non-essential official staff travel is suspended through August 31, 2020.   Any requests for travel, except for deployment to institutions to assist with the COVID-19 pandemic, must be approved by the appropriate Regional Director or Assistant Director.

## LEGAL ACCESS

As courts begin to conduct more criminal and civil proceedings, inmates will need increased access to counsel and legal materials.

Legal calls and/or virtual legal visits:   Telephone calls and/or video conferencing with outside counsel should be accommodated to the extent possible.   Please work with your IT Department to provide and expand virtual access to attorneys whenever possible using either a VTC unit and/or WebEx.

In-Person Legal Visits: Consistent with standing guidance, in-person legal visits should be accommodated upon request. The legal visits should be accommodated based on local resources, and consistent with the following recommendations:

Inmates in medical isolation for COVID-19 should not have in-person legal visits unless absolutely necessary. Strongly consider rescheduling or, as an alternative, utilize video teleconferences (VTC) and telephone legal calls.

Inmates in quarantine for COVID-19 may have asymptomatic COVID-19 infection or be in the incubation period, and should delay legal visits until they are COVID-19 tested negative at the end of quarantine. Video tele-conferencing (VTC) or legal telephone calls with attorneys are recommended as alternatives, if available.

In general, testing an inmate for COVID-19 immediately after a legal visit would have little utility and is not recommended.

Further considerations for in-person legal visits include:

> o Inmates and attorneys/ legal visitors should wear face coverings (cloth or surgical mask) and should perform hand hygiene (washing hand with soap and water or using hand sanitizer) just before and after in-person visits.

> o Use of Plexiglas or similar barrier between inmate and attorney is strongly recommended for in-person visits.   In the alternative, if a barrier is not present, social distancing (i.e., 6 feet apart) should be used.

o Attorney/legal visitors should be symptom screened and temperature checked upon entry into the facility, should wear a face covering, and perform hand hygiene just before and after the legal visit. Legal visitors who are sick or symptomatic should not be allowed to visit.

o If necessary, documents should be passed back and forth in a manner to avoid touching.

o When legal attorney rooms are available, they should be utilized to allow for social distancing among all present in the room. If there is no legal attorney room available and if there are more than one attorney/inmate pair present, all pairs should be separated by more than six feet to the extent possible while protecting attorney-client communications.

o Tables, chairs, and other high-touch surfaces should be disinfected between usage.

Electronic Law Library and Discovery Materials:   Whenever possible, consistent with social distancing protocols and safe institution operations, inmates should be permitted access to the Electronic Law Library (ELL) under conditions determined by the Warden at each facility.   Similarly, inmates will need access to discovery materials relevant to pending cases, beyond those which are maintained by the inmate in his or her cell.   We recommend that a schedule be established to permit fair and timely access to ELL terminals and discovery materials upon inmate request, and that the schedule be provided to inmates at the facility.

## PROGRAMMING

Inmate programming is an essential function in our facilities, and delivery of First Step Act approved Evidence-Based Recidivism Reduction (EBRR) Programs and Productive Activities (PAs) is required by law.   Institutions will offer programming in the following ways:

• Residential programs (i.e., RDAP, BRAVE, SOTP, TCU, FIT, etc.) will immediately resume full time treatment, as required by policy.   Programs may resume groups with more than ten participants, however, other social distancing modifications should remain in place (e.g., holding groups in larger spaces; suspending community meetings).

• Delivery of non-residential EBRR Programs and PAs (e.g., GED, Anger Management) will resume/continue.   These services will be offered at no less than half of their regular capacity.

• Institutions should continue to deliver EBRR and PA programming consistent with the curriculum; however, staff may offer programs on the housing unit or in outdoor or unused spaces for safety/social distancing.

• GED testing, in groups of six or less, will resume with priority given to inmates releasing within 120 days. Other inmates may be tested if resources allow.

Appropriate SENTRY assignments must be used to track program enrollment and participation. Inmates must be recommended for and allowed to sign up for programs that meet their assessed needs.

General population recreation access will resume.   Ordinarily, inmates in groups of no more than 100 will be able to access the recreation yard for a minimum of one hour at a time as long as they remain appropriately distant from one another.   Inmates should have access at least three times per week and attend the recreation yard with inmates from their designated housing units.   Group sports or use of gym equipment (e.g., weights, basketballs) are prohibited.   Small classes that do not involve physical contact may be offered at the discretion of the Warden.   If this occurs, all materials must be thoroughly sanitized after each use.

• Recreation in Special Housing will resume, consistent with standards outlined in policy.

Institutions with active COVID-19 cases may make exceptions to these programming requirements for the safety of staff and inmates.   Modification requests are sent to the Regional Director and concurrence given by the Reentry Services Division.

Beyond program delivery, staff are required to complete needs assessments on all newly-committed inmates, and this process remains in effect during the pandemic. As a reminder, needs are assessed by Unit Team, Health Services, Psychology Services, and Education staff.   The results of the assessments must be keyed into SENTRY or Insight.   Based on the needs assessment, inmates must be enrolled in an appropriate EBRR Program or PA.

## VOLUNTEERS AND CONTRACTORS

Institution access for Volunteers and Contractors will continue as previously described in the Phase Six Action Plan.

## UNICOR

In consultation with Safety & Health Services departments, Wardens will develop plans to safely have UNICOR operations at their institutions running at least 80% capacity no later than September 1, 2020 and 100% normal operation levels no later than October 1, 2020.   Written plans are due to the Regional Directors for approval by Tuesday, August 11, 2020. Wardens whose institutions have a UNICOR operation will also develop and forward plans to establish UNICOR units.   A standard questionnaire for reporting of these plans will be provided by the Assistant Director for FPI.

Exhibit A

Institutions with active COVID-19 cases may make exceptions to these work requirements for the safety of staff and inmates.    Modification requests are sent to the Regional Director and concurrence given by the Assistant Director, FPI.

## COMPLIANCE REVIEWS

Effective immediately, the Program Review Division (PRD) will be conducting unannounced site visits to ensure institution operations conform to the ongoing COVID guidance.    This compliance review will include, but is not limited to, adherence with the Health Services Division guidance on best practices for managing COVID-19 outbreaks, CDC guidance on COVID-19 precautions, and all of the Phase Memorandums outlining our progression as an agency through this crisis.    PRD will soon disseminate written standards that will encompass the scope of their review.

## COURT TRIPS

A number of variables affect the risk of COVID-19 transmission during in-person court appearances and will influence some of the specific management strategies that are needed at each location.    The U.S. Marshals Service (USMS) takes responsibility for the inmate once they leave the BOP institution until their return.    Each USMS district may have their own COVID management procedures.    Individual courts may also have different COVID prevention/mitigation procedures and requirements.    Recognizing the likelihood of BOP inmates mixing with non-quarantined, non-BOP inmates while in USMS custody during a court visit is essential to assess the risk of COVID-19 exposure.

The frequency of an inmate's court appearance and the number of inmates going to a court at any one time are also important factors to consider.    It is recommended that each BOP detention center contact the USMS and the court to ascertain their COVID-19 mitigation procedures and consult with Regional Health Services staff on developing an individualized strategy.    The following are general principles to follow:

- Inmates in COVID isolation should not have in-person court appearances unless absolutely necessary.    Strongly consider the inmate appearing via telephone hearing or via a VTC if it is accessible.

- Inmates in COVID quarantine (intake/exposure) should delay in-person court appearances until they are COVID tested negative at the end of quarantine.    It is recommended that VTC or telephone appearances be used as alternatives.    In general, testing an inmate immediately after a court visit would have little utility and is not recommended as a strategy.    If in-person attendance is required, however, Abbott ID NOW tests can be used on a case-by-case basis if a visit is ordered by the court.

- Inmates should wear face coverings and perform hand hygiene just before departure from and upon return to the institution.

- BOP officials should request to the USMS that BOP inmates be cohorted only within their own housing or quarantine cohort and not be mixed with inmates from other housing units or other institutions, or transported with inmates from other institutions to the extent possible while at court.

- Upon return to the detention center, inmates should be quarantined if they were outside of the institution and were exposed to inmates from other housing units or locations (i.e., county jails).   Periodic testing of inmates with frequent court appearances should be considered.   The 14-day quarantine period must be restarted for any inmate who is in close contact with other inmates not from their housing unit or location.

## INTAKES

As we return to a more normalized inmate movement, the quarantine site model will no longer be utilized.   All inmates entering an institution will require enhanced intake procedures:

- Institutions are to designate specific quarantine and isolation areas in advance with capacity numbers commensurate with anticipated levels and frequency of incoming inmates.   Ideally, inmates should be quarantined or isolated in single-cells, if possible. When cohorting is necessary, the best practice is to keep cohorted inmates together and not add to the cohort when new intakes arrive.

- All new intakes should be screened for COVID-19 on arrival, to include a symptom screen, temperature check, and an approved viral PCR test (either an Abbott ID Now POC test or commercial send out lab test) performed on a sample obtained from a nasopharyngeal, mid-turbinate, or anterior nares swab.

  o Inmates who test positive and/or are symptomatic will be placed immediately in medical isolation.   They will remain in medical isolation until they meet the CDC symptom-based (for symptomatic inmates) or time-based (for asymptomatic inmates) release from isolation criteria.

  o Inmates who are asymptomatic and test negative are placed in quarantine. They will remain in quarantine until:

    ▪ They become symptomatic during the quarantine period.   These inmates should be tested (Abbott or commercial) and placed in medical isolation immediately.   Depending on the housing circumstances, potential contacts (e.g., cellmate, cohort, housing unit) will need to reset their quarantine.   When risk of exposure and/ or spread of transmission is higher, re-testing of potential contacts could be considered.

- A testing frequency of every 3 to 4 days is preferred whenever feasible in consultation with the Regional Infection Prevention and Control Consultant and the Regional Medical Director.

- On or after 14 days.   The inmates who have remained asymptomatic will have a symptom screen, temperature check, and be tested with a commercial lab test.   Inmates should remain in quarantine status until test results are available.   If the test is positive, see above bullet. If the test is negative, the inmate may be released to General Population.

## MOVEMENT

Movement of inmates between BOP institutions can be a simple, short-distance transfer between two institutions or a complex, multi-day, multi-institution process.   The risk of COVID-19 exposure and transmission increases as the complexity of the move increases. Movement variables that increase the risk of COVID-19 exposure and transmission should be avoided whenever possible and include multiple stops, staff and agencies; and potential mixing with other inmate groups from other BOP facilities or other correctional jurisdictions. However, even a direct movement from one facility to another is not without some degree of risk due to the characteristics and communicability of COVID-19.   Refer to the HSD Guidance (6/19/20) for Inmates who are transferring or Releasing from a BOP Facility, https://sallyport.bop.gov/co/hsd/infectious_disease/covid19/docs/guidance_for%20_transferring_or%20releasing%20inmates_20200619.pdf

- As inmate movement operations move toward "normalizing", the number and complexity of inmate moves will increase.   This process of normalizing should be done in a measured approach to allow institutions, regions and the agency develop best practices moving forward.

- Institutions/ Regions should evaluate their space and staffing resources to accommodate increased numbers of the various types of quarantine inmate groups (intake, exposed and pre-release) as well as isolation inmates in various stages of the process.   Various and/or large groups of quarantine and isolation inmates may require a re-distribution of inmates amongst institutions within a region.

- The first step in ensuring safe inmate movement is a full test-in/out, 14-day pre-release quarantine of transferring inmates prior to transport.

  o Planning an inmate move should occur with enough time in advance to allow for a full test in/out 14-day quarantine and turnaround time for test results (21 days).

Exhibit A

- o Planning should be coordinated with all the institutions involved from the beginning stages so that setting of dates will allow for the above process to occur for all the potential inmates on that move.

- o Inmates who have tested negative at the completion of their quarantine should stay in quarantine status until they are transferred, preferably within 5 days of the negative result, but may still move within 14 days of the negative result.

- o If an inmate develops symptoms and/or tests positive, they will not be permitted to travel until they have met the CDC symptom or time-based criteria for release from isolation.    On rare occasions, there may be exceptions where an inmate must travel prior to the completion of this process or even with a positive result (e.g., court ordered transfer). In these cases, the transfer must be discussed and approved by local executive staff from the institutions and regions involved with input from health services staff, as needed.

- o For inmates who have previously tested positive for COVID-19: (refer to https://sallyport.bop.gov/co/hsd/infectious_disease/covid19/docs/covid19_testing_expanded_inmate_testing_strategies_2020619.pdf)

  - ▪ If they meet CDC release from isolation criteria and are within 90 days of their original COVID-19 diagnosis (initial symptom onset for symptomatic patients or initial positive COVID-19 test for asymptomatic patients), they do not need any further testing or quarantine prior to transfer.

  - ▪ If they meet CDC release from isolation criteria but are more than 90 days out from their original COVID-19 diagnosis, they should be placed in quarantine and tested just like an inmate who has never had the infection.

  - ▪ If the test is positive, they cannot travel and must be placed in isolation until they meet the CDC release from isolation criteria.

- Planning of inmate movement should be coordinated with close involvement of local Executive Staff, CMC, Unit Team, and Health Services staff from all involved institutions/regions and transport agencies.    Communication and accurate information are vital to ensure a proposed inmate movement has minimized any potential risk of COVID-19 exposure/transmission.

- To the extent possible, manifests should be generated that allow for appropriate social distancing during transport (e.g., loading a bus/ plane at 50% capacity).

Exhibit A

- "Normal" transport routes and schedules will need to be reviewed and reconsidered. Inmate movement should be coordinated in a manner that:

  - **Has minimal stops/holdovers:** e.g., consider institutions meeting at a halfway point to pick-up inmates rather than having multiple stops and holdovers.

  - **Minimizes the amount of time inmates are held in holdover:** the longer an inmate spends in transit, the greater the risk. The frequency of certain drop offs/pick-ups may need to be increased to minimize holdover times.

  - **Avoids mixing of inmate groups** as much as possible:

    - The following Inmate group terms will be defined as follows:

      - **BOP group** - inmates who have completed a full test in/out pre-release/transfer quarantine process prior to transfer from a BOP facility.

      - **Non-BOP group** - inmates from other agency/correctional jurisdiction who have not undergone a full test in/out quarantine.

    - Maximize runs with only BOP groups; make every effort to coordinate runs for Non-BOP groups separately.

    - There are many scenarios where mixing of BOP groups from different BOP institutions is unavoidable. If all BOP-groups have been properly tested in/out of a pre-release/transfer quarantine just prior to transport at their sending institution, this practice is acceptable.

    - Ideally, any non-BOP group during a transfer will have been tested for COVID-19 prior to transport.   However, this is often not possible or verifiable.   All non-BOP group inmates must have a temperature check and symptom screen immediately prior to transport.   Anyone with a known positive COVID-19 test or who has fever or symptoms will not be admitted on the transport.

    - If a BOP group is mixed with a non-BOP group at any point in the transfer process, all the inmates in that group will require intake screening, testing

and intake quarantine (asymptomatic) or isolation (symptomatic) at their destination institution.

- During transport, BOP-group inmates should wear at least facial coverings and staff should wear at least facial covering and gloves. For transport of Non-BOP or mixed groups, inmates should wear surgical masks and staff should wear surgical masks and gloves during transport and add gown and eye protection with direct contact.

- Documentation on the BEMR exit summary/transfer paperwork (e.g. In-Transit Form) needs to include results of the symptom screen and temperature check performed within 24 hours of release or transfer; the most recent COVID-19 test result; and the inmate's COVID-19 history.   To ensure proper documentation of negative COVID-19 testing from a commercial lab is displayed on the exit summary, the **BOP ICD code of Z03818-c19** will need to be added to the inmate's health problem list.   This marking will then display properly upon the inmate Exit Summary.   The BEMR Exit Summary/transfer paperwork should be provided to the bus LT/USMS to verify that a commercial lab test has been completed with a negative test result.

- **Holdover Sites/Bus Hubs:**

  o Holdover/ Bus hub sites should designate specific holdover quarantine areas in advance in numbers commensurate with anticipated levels and frequency of incoming inmates.

  o For BOP group transfers that have not mixed with Non-BOP groups and require holdover at a facility, the BOP groups can generally be placed directly into a holdover unit setting without a test in/out process and do not need to complete a full 14-day quarantine prior to moving on to their next destination.

  o These holdover groups should be housed separately from the new intake, post-exposure and prior to release/transfer* quarantine groups at that institution.

  *Note there is a distinction between inmates coming from another institution in holdover status waiting to "transfer"/continue on to their next destination vs. inmates that are originating from the holdover site and waiting to transfer.

  o The various holdover groups may be housed together, if necessary.

  o If a holdover site/bus hub is known to receive Non-BOP groups, they should consider having designated quarantine/isolation units for them and manage them as new intakes.

- Those inmates that are symptomatic and/or test positive must be placed in medical isolation and can be released after meeting CDC symptom- or time-based criteria for release from isolation into general population or transfer. If transfer is to occur more than 90 days from their initial symptom onset (symptomatic cases) or positive COVID-19 test (asymptomatic cases), the inmates will need to be quarantined and tested prior to transfer.

- Those who are asymptomatic and test negative will be placed in quarantine. When they complete quarantine and test-out:

  - Inmates who are expected to remain at the holdover site for a prolonged period of time can be released to General Population. If they are released to General Population, future transfers will require pre-transfer test-in/test-out quarantine.

  - For those inmates expected to transfer within a reasonable period of time, they should remain in quarantine until their transfer date. They should transfer within 14 days of the test-out negative result or be re-tested prior to transfer.

- If a holdover site/bus hub receives a mixed group of BOP and Non-BOP groups or BOP group that has previously mixed with a Non-BOP group, they must now all be managed as a Non-BOP group.

## DESIGNATED (FINAL RECEIVING) INSTITUTIONS:

Transferred inmates will undergo the same process as a new intake, to include intake screen and temperature check, COVID-19 testing and isolation vs new intake quarantine at the final designated facility.   One exception to this process is the inmate who has previously tested positive, has met the CDC's symptom- or time-based release from isolation criteria, and is within 90 days of the initial symptom onset or positive test. Such cases do not need to be quarantined upon arrival at the designated facility.

## Questions

If staff have questions about COVID-19, they may reach out to the agency at the following email box: COVID19Questions@bop.gov.

We appreciate your assistance and cooperation in this important matter.

Exhibit A

Attachment 6



**U.S. Department of Justice**
Federal Bureau of Prisons

_Washington, D.C. 20534_

November 1, 2020

**MEMORANDUM FOR ALL CHIEF EXECUTIVE OFFICERS**

**FROM:**        ANDRE MATEVOUSIAN, ASSISTANT DIRECTOR
            CORRECTIONAL PROGRAMS DIVISION

**SUBJECT:**     **CORONAVIRUS (COVID-19) EXTENSION TO PHASE NINE ACTION PLAN**

The BOP will continue its nationwide action as described in the Phase Nine Action Plan dated August 5, 2020, along with the modification guidance on August 31, 2020.   These measures will remain in place until further notice.

If staff have questions about COVID-19, they may reach out to the agency at the following email box: COVID19Questions@bop.gov.

We appreciate your assistance and cooperation in this important matter.

Exhibit A